Terry Jennings, Justice
Appellants, Robert Kubbernus and Balaton Group, Inc. ("Balaton") (collectively, "appellants"), challenge the trial court's judgment, entered after a jury trial, in favor of appellees, ECAL Partners, Ltd., Draco Capital, Inc., Robert Mendel, as assignee of Edward Pascal, Robert Mendel, Robert Mendel, as assignee of Stanley Beraznik, Robert Mendel, as assignee of Don Bui, Robert Mendel, as assignee of Ben Ariano, 3791068 Canada, Inc., Peter Taylor, Darshan Khurana, Matteo Novelli, Sequoia Aggressive Growth Fund, Ltd., as assignee of Achim Glauner, Sequoia Aggressive Growth Fund, Ltd., as assignee of Karl-Heinz Glauner, Sequoia Aggressive Growth Fund, Ltd., as assignee of Christian Glauner, Sequoia Aggressive Growth Fund, Ltd., Sequoia Aggressive Growth Fund, Ltd., as successor to Sequoia Diversified Growth Fund, Sequoia Aggressive Growth Fund, Ltd., as assignee of Rig III, Ltd., Sequoia Aggressive Growth Fund, Ltd., as assignee of Aran Asset Management, Sequoia Aggressive Growth Fund, Ltd., as assignee of Semper Gestion, S.A., Eosphoros Asset Management, Inc., Ashwin Sairam, 99869 Canada, Inc., David Burtnik, Mary Hanemaayer, Marlene Tersigni, and George DeWolf (collectively, "appellees"), in their suit against appellants for securities violations under the Texas Securities Act ("TSA"),[1] breach of contract, breach of fiduciary duty, and fraud. In two issues, appellants contend that the evidence is insufficient to support the jury's findings in favor of appellees on their claims for securities violations and attorney's fees under the TSA;[2] certain appellees cannot bring suit under the TSA; and certain appellees' securities-violations claims are barred by the TSA's statute of *451 repose.[3]
We affirm.
Background
In their fifth amended petition, appellees alleged that SkyPort Global Communications, Inc. ("SkyPort"),[4] a Texas-based satellite-technology company, was founded in the late 1990s "by a group of Houston-based business executives and NASA telecommunications experts for the purpose of developing a satellite-communications facility" in Houston, Texas. SkyPort was intended to be "the most advanced and secure satellite-communications facility in the United States" and designed to "provide highly secure telecommunications services to federal and state agencies, as well as to various commercial customers." In March 1999, SkyPort entered into a long-term lease at Ellington Air Force Base in Houston, Texas and began obtaining from the Federal Communications Commission ("FCC") the licenses that it would need to operate a teleport.[5] During this time, SkyPort began raising "several million dollars from investors to finance its activities," estimating that it would need approximately $ 14 million to construct and equip its teleport.
In 2002, CenturyTel, Inc. ("CenturyTel"),[6] a large telecommunications company interested in satellite technology, invested $ 8 million to fund the building of SkyPort's teleport. As part of the deal, SkyPort was reorganized into SkyComm, a Delaware holding company with its principal office and activities in Houston, Texas. And SkyPort became a wholly-owned subsidiary of SkyComm, operating in Texas. In exchange for its investment, CenturyTel received SkyComm debentures, which could be converted into shares of SkyComm common stock.[7] CenturyTel continued to fund SkyPort's operation for several years.
In 2003, SkyPort completed its teleport and began providing services to customers in January 2004. In 2005, CenturyTel determined that it had erred in investing in "satellite technology," and it announced that it would be "abandon[ing] SkyPort." In July 2005, CenturyTel stopped funding SkyPort, and by November 2005, SkyComm and SkyPort were forced to file for *452 bankruptcy protection. At this time, CenturyTel began looking for a buyer to purchase its SkyComm debentures ("CenturyTel's debentures") and "tak[e] over [its] role as lead investor in SkyPort."
In late November 2005, Kubbernus, a purported "expert in finding and profiting from 'undervalued' and 'deeply discounted' companies," was introduced to CenturyTel. Kubbernus offered to raise money on behalf of SkyComm and SkyPort so that they could emerge from bankruptcy. Kubbernus also offered to infuse new equity capital into SkyComm and SkyPort and to arrange for the selling of CenturyTel's debentures. Acting through Balaton, his Canadian investment-banking firm, Kubbernus planned to raise money from a group of investors to purchase CenturyTel's debentures and 133 million to-be-issued shares of SkyComm common stock. The investor group would then convert the debentures that it had purchased from CenturyTel into shares of SkyComm common stock and "control super-majority ownership" in SkyComm and SkyPort. Kubbernus also intended to raise additional funding for SkyComm and SkyPort through "SkyComm private placements" and to take the company public within a year.
CenturyTel accepted Kubbernus's proposal, and in December 2005, CenturyTel and SkyComm executed Letters of Intent with Balaton and Kubbernus's investor group, whose members Kubbernus had not yet solicited or identified. Pursuant to the Letters of Intent, Kubbernus's investor group would loan money to SkyComm and SkyPort so that they could emerge from bankruptcy, and the investor group would purchase CenturyTel's debentures and the 133 million shares of SkyComm common stock.[8]
In February 2006, Kubbernus formed ClearSky Investments, Ltd. ("ClearSky"), a Delaware limited partnership, to serve as the investment vehicle to raise funds for the purchase of CenturyTel's debentures and the 133 million shares of SkyComm common stock. Kubbernus controlled ClearSky through its general partner, ClearSky Management, Inc. ("ClearSky Management"), an entity wholly owned by Balaton and managed by Kubbernus. In connection with the solicitation of investors for ClearSky (the "ClearSky Investors"),[9] Balaton prepared a Confidential Investment Memorandum and the ClearSky Limited Partnership Agreement. Both documents stated that ClearSky had been formed solely for the purpose of acquiring a controlling interest in SkyComm and SkyPort. And they provided that through the ClearSky Investors, Kubbernus intended for ClearSky to raise up to $ 10 million so that it could purchase CenturyTel's *453 debentures and the 133 million shares of SkyComm common stock (the "SkyPort transaction"). After CenturyTel's debentures were purchased, ClearSky would then convert the debentures into 108 million shares of SkyComm common stock. And ClearSky would ultimately end up owning 80.73% of SkyComm and SkyPort.
On February 15, 2006, CenturyTel and Balaton executed a Debenture Purchase Agreement (the "DPA"), which provided that The Watershed Funds, Ltd. ("Watershed"), a Cayman Islands shell corporation that was never actually formed by Kubbernus, would purchase CenturyTel's debentures for $ 3 million.[10] According to appellees, Watershed was merely a placeholder under the DPA for ClearSky, which would acquire ownership of the debentures at closing of the SkyPort transaction, and its investors would actually fund the purchase of CenturyTel's debentures.[11] Contrary to what the ClearSky Investors were told, however, the DPA was later amended, shortly before the closing of the SkyPort transaction, to substitute Balaton for Watershed as the purchaser of CenturyTel's debentures.
Also, on February 15, 2006, Balaton signed a DIP Credit Agreement with SkyPort, in which it agreed to provide SkyPort with $ 1.5 million, funds that would actually come from the ClearSky Investors. It also signed a Credit Agreement and a Securities Purchase Agreement (the "SPA") with SkyComm. Pursuant to the SPA, Balaton would receive 133 million shares in SkyComm common stock in exchange for $ 4 million. The SPA was conditioned upon the FCC approving the transfer of control of SkyComm and SkyPort and provided that Balaton could name additional purchasers of the shares of SkyComm common stock at a later date. On March 15, 2006, SkyComm and SkyPort emerged from bankruptcy.
As previously noted, appellees alleged that ClearSky was intended to serve as the sole investment vehicle for the purchase of CenturyTel's debentures and the 133 million shares of SkyComm common stock. Through ClearSky, appellants sought to raise a minimum of $ 1 million and a maximum of $ 10 million from the ClearSky Investors. According to the Confidential Investment Memorandum, dated February 2006 and prepared by Balaton, ClearSky, pursuant to the DIP Credit Agreement executed by Balaton, would transfer $ 1.5 million to SkyPort and, pursuant to the Credit Agreement, up to $ 4 million to SkyComm. And ClearSky, pursuant to the SPA, would purchase the 133 million shares of SkyComm common stock at the closing of the SkyPort transaction. ClearSky, pursuant to the DPA, would also acquire all of CenturyTel's debentures and convert them into 108 million shares of SkyComm common stock. And the closing of the SkyPort transaction would be deferred until the FCC approved the acquisition of control of SkyComm and SkyPort by ClearSky.
Appellees further alleged that the Confidential Investment Memorandum stated unequivocally that ClearSky would "acquire ownership of SkyComm common stock," "purchase an aggregate of 133[ ] [million] shares of [SkyComm common] stock," "purchase $ 20,596,000 face amount of ... [CenturyTel's] debentures,"
*454 and "convert the debentures into [shares of SkyComm common] stock." (Internal quotations omitted.) And the ClearSky Limited Partnership Agreement stated that if $ 10 million in funds were invested in ClearSky by the ClearSky Investors, then ClearSky "would acquire a 76% ownership interest in SkyComm, which would increase to 82%" upon the exercise of certain warrants.[12]
Appellees also alleged that Kubbernus, from the outset, "had no intention [of] perform[ing] in accordance with the representations stated in the Confidential Investment Memorandum and the [ClearSky] Limited Partnership Agreement."[13] However, Kubbernus convinced the ClearSky Investors to invest in ClearSky by falsely promising that ClearSky would own SkyComm and SkyPort after the closing of the SkyPort transaction.
According to appellees, after the ClearSky Investors had invested $ 7 million in ClearSky, Kubbernus and Balaton deliberately cutoff further investments in ClearSky and made no attempt to reach the $ 10 million maximum goal set out in the Confidential Investment Memorandum and the ClearSky Limited Partnership Agreement. Instead, Kubbernus began soliciting investors to buy stock directly in SkyComm. Ultimately, he raised more than $ 8 million from other investors, but chose to keep those funds outside of ClearSky. In fact, certain ClearSky Investors who wanted to make additional investments in ClearSky were told by Kubbernus that ClearSky was "full" and their additional investments would be placed directly in SkyComm. (Internal quotations omitted.)
On November 2, 2006, the SkyPort transaction closed in Houston, Texas. At closing, Balaton used the $ 7 million in funds invested by the ClearSky Investors in ClearSky to acquire CenturyTel's debentures and the 133 million shares of SkyComm common stock. Contrary to representations made by appellants, ClearSky received nothing at closing, and none of the ClearSky Investors received anything for the $ 7 million that they had invested. Instead, appellants structured the deal so that Balaton would take sole title of CenturyTel's debentures and the 133 million shares of SkyComm common stock. In other words, at the closing of the SkyPort transaction, despite the use of the ClearSky Investors' money, "the securities transferring control of SkyPort were ... conveyed only to Kubbernus and his companies." (Emphasis omitted.) ClearSky, the entity that was supposed to receive ownership of SkyComm and SkyPort, did not receive anything.
Appellees further alleged that despite what occurred at closing, Kubbernus subsequently told the ClearSky Investors that all of Balaton's rights under the DPA and the SPA had been assigned to ClearSky and it had actually acquired CenturyTel's debentures and the 133 million shares of SkyComm common stock. Over the next two years, appellants sent financial statements and other materials to the ClearSky *455 Investors purportedly confirming ClearSky's ownership interest in SkyComm and SkyPort. And they "made numerous and repeated representations to the ClearSky Investors and others that ClearSky owned the controlling interest in SkyComm" and SkyPort.[14]
In regard to investors, other than the ClearSky Investors, appellees alleged that after the closing of the SkyPort transaction, appellants began raising, through misrepresentations, funds directly through SkyComm, ultimately raising an additional $ 8,198,843 from mostly foreign investors (the "Additional Investors").[15]
Further, in July 2007, appellants formed Lavell Systems, Inc. ("Lavell") for the purpose of taking SkyComm and SkyPort public. "Lavell was the culmination of [Kubbernus's] plan to recapitalize SkyComm [and SkyPort] and take the company public." The transaction involved appellees exchanging their shares of SkyComm common stock for Lavell stock with Lavell "becom[ing] the publicly-traded holding company for SkyPort." Appellants sold approximately $ 2 million or $ 3 million in convertible notes and other securities to investors (the "Lavell Investors") related to the taking of SkyComm and SkyPort public.[16] However, appellants failed to disclose material information to the Lavell Investors, including that the source of the cash on SkyComm's financial statements was actually from ClearSky and "the individuals now in control of the company had defrauded the [ClearSky] [I]nvestors who had financed SkyComm's [and SkyPort's] recapitalization." Ultimately, "the going-public efforts" were unsuccessful, and the Lavell Investors lost all of their money.
Appellees further alleged that although appellants "raised almost $ 20 million to 'recapitalize' " SkyComm and SkyPort, "very little of that money benefitted the company due to shameless looting through bogus management fees and expenses charged" to SkyComm. And Kubbernus "enrich[ed] himself by looting millions of dollars from both existing and new investors." As a result, any ownership interests *456 and investments made by appellees lost "all value." And in October 2008, SkyComm and SkyPort filed "another petition for relief under Chapter 11 of the Bankruptcy Act" (the "second bankruptcy proceeding"). Related to the second bankruptcy proceeding, Kubbernus filed a proposed reorganization plan, under which SkyComm would be merged into its wholly-owned Texas subsidiary, SkyPort. And Balaton would "emerge as the sole shareholder in the surviving entity." All other shareholders in SkyComm would have their shares expunged. On August 12, 2009, SkyComm was merged into SkyPort, and appellees lost all of their purported interests. According to appellees, "[e]veryone involved" with SkyComm and SkyPort, other than CenturyTel and appellants, "lost everything."
Appellees, who consist of the ClearSky Investors, the Additional Investors, and the Lavell Investors, brought claims against appellants for securities violations under the TSA,[17] breach of contract, breach of fiduciary duty, and fraud. They also sought to recover their attorney's fees.[18]
In regard to their claims for securities violations under the TSA, the ClearSky Investors alleged that limited partnership interests, convertible debentures, and shares of common stock are securities within the meaning of the TSA. Appellants offered and sold directly to the ClearSky Investors limited partnership interests in ClearSky. Appellants also offered to sell indirectly to the ClearSky Investors CenturyTel's debentures and the 133 million shares of SkyComm common stock. These offers and sales were made by means of untrue statements of material fact and omissions to state material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading. The material untrue statements made by appellants, include, but are not limited to:
• That ClearSky would acquire ownership of CenturyTel's debentures and stock;
• That ClearSky would be the party converting CenturyTel's debentures;
• That FCC approval was being sought for ClearSky's ownership of SkyComm and SkyPort;
• That Balaton would assign its contractual rights to ClearSky;
• That the ClearSky offering had a $ 1 million minimum or no minimum; and
• That ClearSky would receive a proportionate share of the SkyComm securities if less than $ 10 million was invested in ClearSky.
The material omissions made by appellants, include, but are not limited to:
• That, if for any reason, the acquisition of control of SkyComm and SkyPort did not close, the ClearSky Investors would lose all of their money;
• That the ClearSky Investors' money would be used to fund Balaton's overhead, to pay Balaton management fees, and for various other undisclosed purposes that benefitted Kubbernus;
• That appellants interpreted the ClearSky Limited Partnership Agreement to not require transfer of ownership of SkyComm and SkyPort to ClearSky unless $ 10 million was invested in ClearSky;
*457 • That the ClearSky Investors were at risk to receive nothing for their $ 7 million investment;
• That the ClearSky Investors were at risk of receiving no consideration for their investment;
• That FCC approval for the transfer of ownership of SkyComm and SkyPort would not be sought for ClearSky; and
• That ClearSky's right to ownership of SkyComm and SkyPort and the identity of the ClearSky Investors would not be disclosed to the FCC.
Further, the ClearSky Investors alleged that appellants sold and offered to sell limited partnership interests, convertible debentures, and shares of common stock by means of untrue promises, which appellants had no intention of performing, i.e., that ClearSky would be assigned the contractual right to acquire CenturyTel's debentures and the 133 million shares of SkyComm common stock and appellants would transfer ownership of CenturyTel's debentures and the 133 million shares of SkyComm common stock to ClearSky. The ClearSky Investors sought damages, costs, and attorney's fees under the TSA.[19]
In regard to their claims for securities violations under the TSA, the Additional Investors alleged that appellants controlled SkyComm and appellants made the sales and offers of shares of SkyComm common stock through untrue statements of material fact and omissions to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading. The material omissions made by appellants, include, but are not limited to:
• That all of the ClearSky Investors' funds had been misappropriated by Kubbernus for Balaton;
• That the cash on SkyComm's balance sheet had been obtained by fraud on ClearSky;
• That the shares of SkyComm common stock represented to be owned by Balaton had been promised to ClearSky; and
• That the ClearSky Investors who had put money into recapitalizing SkyComm and SkyPort lost all of their money and received nothing in return.
The Additional Investors sought damages, costs, and attorney's fees under the TSA.[20]
In regard to their claims for securities violations under the TSA, the Lavell Investors alleged that appellants controlled SkyComm at the time that they solicited the sale of securities to finance the "Lavell IPO" and the solicitations for the Lavell securities largely emanated from Texas. Further, a significant portion of the securities sold in connection with the Lavell transaction were actually securities issued by SkyComm, which provided "rights" in the shares of the prospective IPO. (Internal quotations omitted.) According to the Lavell Investors, the sales and offers by appellants to them were made by means of untrue statements of material fact and omissions to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading. The material omissions made by appellants, include, but are not limited to:
• That the cash on SkyComm's balance sheet had been obtained by fraud on ClearSky;
*458 • That the shares of SkyComm common stock represented to be owned by Balaton had been promised to ClearSky; and
• That the ClearSky Investors who had put money into recapitalizing SkyComm and SkyPort lost all of their money and received nothing in return.
The Lavell Investors sought damages, costs, and attorney's fees under the TSA.[21]
At trial, Adrien Pouliot, a ClearSky Investor,[22] testified that his company, Draco Capital, Inc., invested $ 3,816,523 in ClearSky. However, despite his company's investment, it did not receive any ownership rights in SkyComm or SkyPort.
In February 2006, Pouliot was introduced to Kubbernus, who flew to Canada to meet with him and present the opportunity to invest in ClearSky. During their meeting, Kubbernus told Pouliot that there was "a teleport operating company in Houston[, i.e., SkyComm and SkyPort,] that was ... in bankruptcy." According to Kubbernus, SkyComm and SkyPort presented "a great opportunity to buy [a] company at a low price and turn it around, operate it and eventually ... sell it." Kubbernus told Pouliot that he had acquired the right, by virtue of a number of agreements that he had signed in February 2006, to "buy [SkyComm and SkyPort] from its current owners." Kubbernus explained the structure of the SkyPort transaction and gave Pouliot a copy of the DIP Credit Agreement, the Credit Agreement, the SPA, and the DPA.
In regard to the structure of the SkyPort transaction, Kubbernus told Pouliot that a group of investors, the ClearSky Investors, would invest money in a limited partnership, i.e., ClearSky, with the goal of raising $ 10 million. The general partner of ClearSky would be ClearSky Management, a shell-company owned by Balaton. The money invested in ClearSky by the ClearSky Investors would be used for two purposes related to the acquiring of ownership of SkyComm and SkyPort. First, $ 3 million of the ClearSky Investors' money would be used by ClearSky to purchase CenturyTel's debentures, which ClearSky would subsequently convert into 108 million shares of SkyComm common stock. Second, $ 4 million of the ClearSky Investors' money would be paid to SkyComm directly in exchange for the 133 million shares of SkyComm common stock. As compensation for its role as general partner, ClearSky Management, i.e., Balaton, would receive 30% "of the equity investment of ClearSky," and the ClearSky Investors would receive 70%.
Pouliot explained that the purpose of the Confidential Investment Memorandum, prepared by Balaton, was to provide him and other ClearSky Investors with information about the SkyPort transaction to consider when making their decision whether to invest in ClearSky. Pouliot reviewed the memorandum and relied on it for that purpose, and he relied on it when he decided to invest his company's money in ClearSky.
According to the Confidential Investment Memorandum, admitted into evidence by the trial court, the minimum amount of money that the ClearSky Investors had to invest in ClearSky for the SkyPort transaction was $ 1 million, while the maximum amount of money that they *459 could invest was $ 10 million. The memorandum provided, in pertinent part:
ClearSky Limited Partnership (the "Partnership") has been formed for the purpose of acquiring control of SkyPort International Inc. ("SkyPort") through its parent corporation, SkyComm Technologies Corporation ("SkyComm") , and assisting SkyComm and SkyPort in realizing significant capital appreciation through organic and structured growth. The General Partner of the Partnership is ClearSky Management, Inc., a wholly-owned subsidiary of Balaton Group Inc. ("Balaton")....
The investment contemplated by this offering will support the acquisition and re-structuring of SkyComm and SkyPort by the Partnership. Balaton will assign to the Partnership its rights under certain agreements it has entered into with SkyComm, SkyPort and their secured creditors. By applying the maximum proceeds of this offering in exercise of the rights offered by such agreements, the Partnership will acquire ownership of SkyComm common stock and securities of SkyComm convertible into SkyComm common stock representing approximately 76% percent of the issued and outstanding shares of SkyComm, together with common stock purchase warrants which, if exercised by the Partnership, would increase its fully-diluted ownership position to 82%, excluding any dilution resulting from further recapitalization of SkyComm. The General Partner plans to take SkyComm public within 12 months following the completion of the offering....
....
SUMMARY OF THE OFFERING
Issuer Clear Sky Investments, LP....
Issue Class A Limited Partnership interests structured as units....
Issue Amount/Size A minimum of US $ 1,000,000 ... and a maximum of US $ 10,000,000....
....
Use of Proceeds ....
(iii) The Partnership will purchase an aggregate of 133,000,000 shares of common stock and 133,000,000 warrants of SkyComm for an aggregate purchase price of $ 4,000,000. The equity subscription will be used in part to repay the principal amount of the Exit Credit Facility, with the balance to be made available to SkyPort for general working capital purposes. Completion of the equity investment will be deferred until receipt of FCC approval to the acquisition of control of SkyComm and SkyPort by the Partnership ;
(iv) The Partnership will purchase $ 20,596,000 face amount of convertible debentures of SkyComm from the incumbent holder. The debentures convert into an aggregate of 108,000,000 shares of common stock of SkyComm. Completion of the purchase will be deferred until receipt of FCC approval to the acquisition of control of SkyComm and SkyPort by the Partnership.
....
Investment Objectives The objective of the Partnership is to provide to the holders of Class A Units with significant capital appreciation generated by (a) the revitalization and growth of SkyPort; and (b) an enhanced valuation, achieved by seeing the company through the "going public" process *460 and thereby creating liquidity and a greater multiple on earnings.
(Emphasis added.)
Pouliot further testified that the Confidential Investment Memorandum and the representations that he received from appellants led him to believe that, by virtue of the SkyPort transaction, ClearSky would acquire, own, and control SkyComm and SkyPort. In fact, the memorandum stated that the entire purpose of the formation of ClearSky was to raise money to obtain ownership and control of SkyComm and SkyPort. However, it did not state that the ClearSky Investors were required to invest $ 10 million in ClearSky for the SkyPort transaction to occur.[23] And appellants never told Pouliot that there was a chance that ClearSky would not acquire any ownership of SkyComm and SkyPort by virtue of the SkyPort transaction.
According to Pouliot, appellants, through statements made in the Confidential Investment Memorandum, further represented that Balaton would assign any rights or interests it had acquired in SkyComm and SkyPort to ClearSky as part of the SkyPort transaction. And appellants, through statements made in the memorandum, informed Pouliot that ClearSky would be the entity that purchased CenturyTel's debentures and the 133 million shares of SkyComm common stock. In other words, appellants represented that under the terms of the SkyPort transaction, as described in the memorandum, ClearSky would pay CenturyTel $ 3 million and receive $ 20,596,000 in convertible debentures, and ClearSky would pay SkyComm $ 4 million and receive the 133 million shares of SkyComm common stock. Moreover, pursuant to the memorandum, appellants would seek approval from the FCC for ClearSky's ownership and control of SkyComm and SkyPort.[24]
In regard to the SPA, an agreement between SkyPort, Balaton, and "other purchasers named [there]" for the purchase of the 133 million shares of SkyComm common stock, Pouliot noted that he had reviewed the document before he decided to invest his company's money in ClearSky. According to Pouliot, although ClearSky was not a party to the SPA when it was initially signed, the agreement specifically provided a mechanism by which ClearSky could be added as a "purchaser" of the 133 million shares of SkyComm common stock. And this fact supported the representations in the Confidential Information Memorandum and ClearSky Limited Partnership Agreement that ClearSky was the entity purchasing the 133 million shares of SkyComm common stock pursuant to the SPA.
Further, Kubbernus told Pouliot that when money was invested by the ClearSky Investors into ClearSky, Balaton would assign its rights under the SPA to ClearSky, and the assignment would take place by adding ClearSky's name to Schedule A of the SPA.[25] Pouliot, in making his decision *461 to invest, relied on the representation that ClearSky's name would be added to the SPA.
The SPA, admitted into evidence by the trial court, provided, in pertinent part:
This Securities Purchase Agreement ("Agreement") is made and entered into as of the 15th day of February, 2006, by and among SkyComm Technologies Corporation, a Delaware corporation ("Company"), having its principal office at 2 Northpoint Drive, Suite 230, Houston, Texas 77060, Balaton Group Inc., an Ontario corporation, having an office at 152 King Street East Toronto, Ontario, MSA 1J3 ("Balaton"), and any other purchasers who may be joined to this Agreement from time to time and identified as a purchaser in Schedule A hereto, as such schedule may be amended from time to time prior to the First Closing Date (as defined herein) (each such party and Balaton being a "Purchaser" and collectively, being the "Purchasers").
....
WHEREAS , the Company, through its wholly-owned subsidiary, SkyPort International, Inc., a Texas corporation ("SkyPort"), is primarily engaged in the business of operating a satellite services company;
WHEREAS , the Company intends to issue up to 133,333,335 units ("Units"), each Unit to consist of one share of common stock of the Company, par value $ 0.001 per share ("Common Stock"), and one warrant to purchase one share of Common Stock of the Company ("Warrant"), and Balaton desires to purchase Units, and if no other Purchasers are joined to this Agreement, all 133,333,335 Units, subject to the terms and conditions contained herein;
....
ARTICLE I
AUTHORIZATION AND SALE
Section 1.1 Authorization. Subject to the terms and conditions hereof, the Company has authorized: (a) the sale and issuance of up to 133,333,335 Units; and (b) the reservation for issuance of up to 133,333,335 shares of the Company's Common Stock upon exercise of the Warrants issued as part of the Units ("Warrant Shares").
Section 1.2 Sale of Units. Subject to the terms and conditions contained in this Agreement, the Company hereby agrees to issue and sell and Purchasers hereby agree to purchase from the Company from time to time, an aggregate of 133,333,335 Units at a price of $ 0.03 per Unit (the "Purchase Price").
(Emphasis added.)
In regard to the DPA, an agreement initially between CenturyTel and Watershed for the purchase of CenturyTel's debentures, Pouliot testified that Kubbernus told him that he had negotiated the right to assign the DPA. Moreover, ClearSky would be substituted for Watershed in the DPA because Watershed "was not going to get off the ground." Pouliot reviewed the DPA before he invested his company's money in ClearSky, and it expressly provided that Watershed's rights under the agreement could be assigned to ClearSky. Thus, Pouliot believed appellants' representations that ClearSky would purchase CenturyTel's debentures under the DPA.
The DPA,[26] admitted into evidence by the trial court, states, in pertinent part:
*462 This DEBENTURE PURCHASE AGREEMENT (this "Agreement"), dated as of February 15, 2006, is by and between CenturyTel, Inc., a corporation incorporated under the laws of the State of Louisiana (the "Seller''), and The Watershed Funds, Ltd., a corporation incorporated under the laws of the Cayman Islands (the "Purchaser"), and is joined into as of such date by Balaton Group, Inc., a corporation incorporated under the laws of the Province of Ontario, Canada ("Balaton"), for the purposes of guaranteeing the Purchaser's obligations hereunder (the "Balaton Guaranty") and by SkyComm Technologies Corporation, a corporation incorporated under the laws of the State of Delaware ("SkyComm"), for the limited purposes described hereinafter.
....
WHEREAS, the Seller owns (i) $ 20,596,000 aggregate principal amount of convertible debentures (which are described further on Exhibit A and are hereinafter referred to as the "Debentures") issued by SkyComm, which owns all of the issued and outstanding capital stock of SkyPort International, Inc. ("SkyPort"), a Texas corporation subject to bankruptcy proceedings (the "SkyPort Bankruptcy Proceedings") following its filing on November 21, 2005 of a voluntary petition for reorganization under the federal bankruptcy code, and (ii) a revolving promissory note dated July 1, 2005 in the principal amount of $ 750,000 made by SkyComm and SkyPort (the "Revolving Note");
WHEREAS, the Debentures are convertible into shares of common stock of SkyComm that, upon issuance, would constitute over 50% of SkyComm's capital stock;
WHEREAS, as one component of a comprehensive plan of Balaton to recapitalize SkyComm and SkyPort (the "Recapitalization Plan"), the Seller wishes to sell, transfer, assign, convey and deliver the Debentures to the Purchaser, and the Purchaser wishes to purchase, acquire and accept the Debentures from the Seller, in each case upon the terms and conditions of this Agreement ; and
WHEREAS, simultaneously with the execution of this Agreement, Balaton has entered into definitive recapitalization agreements with SkyComm and SkyPort (collectively, the "Recapitalization Agreements"), including the DIP credit agreement (the "DIP Agreement"), the credit agreement (the "Credit Agreement") and the securities purchase agreement;
....
ARTICLE I
SALE AND PURCHASE OF DEBENTURES
Section 1.01. Sale of Debentures. Subject to the terms and conditions specified herein, on the Closing Date (as defined in Section 1.05(a)) (i) the Seller shall sell, transfer, assign and convey all of its right, title and interest in the Debentures to the Purchaser, free and clear of any lien, security interest, pledge, mortgage or other encumbrance *463 ("Lien") with respect thereto, and (ii) the Purchaser shall purchase, acquire and accept the Debentures in exchange for the Purchase Price (as defined in Section 1.02).
Section 1.02. Purchase Price. The aggregate purchase price for all of the Debentures (the "Purchase Price") shall be (i) $ 3.0 million cash , which the Purchaser agrees to pay at the Closing (as defined in Section 1.05(a)), and (ii) the Purchaser's commitment to make reimbursement payments under Section 1.03.
(Emphasis added.)
In addition to reviewing the Confidential Investment Memorandum, the SPA, and the DPA provided to him by appellants, Pouliot traveled to Houston, Texas to tour SkyPort's facilities, meet with SkyPort's representatives and entire management team, including SkyPort's president, and attend management presentations. And Pouliot had additional meetings with Kubbernus, during which they discussed SkyComm and SkyPort and various "scenarios[,] including what would happen" to the ownership of SkyComm and SkyPort if the ClearSky Investors did not invest $ 10 million in ClearSky, but instead only invested $ 7 million.[27]
Before making his investment, Pouliot also received additional documents from appellants, including a "cap table," admitted into evidence by the trial court. The "cap table" specifically stated that at the closing of the SkyPort transaction, ClearSky would pay $ 3.24 million to CenturyTel in exchange for its debentures, which ClearSky could then convert into 108 million shares of SkyComm common stock. And ClearSky would pay $ 4 million to SkyComm in exchange for the 133 million shares of SkyComm common stock. Pouliot also received from Kubbernus a document titled, "SkyPort Strategies," admitted into evidence by the trial court, which discussed what would happen if the ClearSky Investors invested only $ 7 million in ClearSky. Based on this document, appellants represented that the SkyPort transaction would still go forward, with ClearSky obtaining ownership of SkyComm and SkyPort. And appellants never stated that ClearSky would not receive any ownership in SkyComm or SkyPort if the ClearSky Investors invested only $ 7 million in ClearSky.
Additionally, Kubbernus gave Pouliot a document titled "SkyPort Shareholders List," admitted into evidence by the trial court, which showed that Balaton would assign its rights and interests in SkyComm and SkyPort to ClearSky. In fact, Kubbernus hand-wrote[28] ClearSky's name on the document to illustrate that ClearSky, upon the closing of the SkyPort transaction, would own the 133 million shares of SkyComm common stock and an additional 108 million shares in SkyComm common stock after the conversion of CenturyTel's debentures. While discussing this document, Kubbernus told Pouliot, "Don't worry.... [I]t's going to be ClearSky that's going to end up with these shares." (Internal quotations omitted.) He also said, and the "SkyPort Shareholders List" showed, that if the ClearSky Investors invested only $ 1 million in ClearSky, then ClearSky would receive 22,703,333 shares of SkyComm common stock, and if the ClearSky Investors invested only $ 7 million in ClearSky, *464 then ClearSky would receive 158,923,333 shares of SkyComm common stock.[29] Notably, before Pouliot decided to invest his company's money in ClearSky, appellants did not tell him that he and the other ClearSky Investors would receive "nothing" and lose all of their money if they did not invest $ 10 million in ClearSky.
Pouliot further testified that in September 2006, he decided to invest, through his company, Draco Capital, Inc., in ClearSky. In doing so, Pouliot relied on the aforementioned representations made by appellants and the documents provided to him by appellants. And in the course of making his investment, Pouliot, like every ClearSky Investor, signed the ClearSky Limited Partnership Agreement,[30] admitted into evidence by the trial court. It provides, in pertinent part:
ARTICLE II
ORGANIZATION
....
2.2. Name. The name of the Partnership shall be "Clear Sky Investments, L.P."
....
2.6. Purpose. The purpose of the Partnership is to use the maximum aggregate initial Class A Limited Partners' maximum Capital Contributions of US $ 10,000,000 to acquire debt and equity securities of SkyComm Technologies Corporation ("SkyComm") and its wholly owned subsidiary SkyPort International Inc. ("SkyPort") pursuant to and in accordance with the agreements to be assigned to the Partnership by Balaton Group Inc. ("Balaton") and The Watershed Funds Ltd. ("Watershed") described in Exhibit B to this Agreement and to assist management of SkyComm and Sky Port in revitalizing the operating business of SkyPort and seeing SkyComm through a going public transaction and thereby enhancing the fair market value of the Securities held by the Partnership for the benefit of the Partners. The maximum aggregate initial Class A Limited Partners' Capital Contributions of US $ 10,000,000 if completed, will support the acquisition and re-structuring of SkyComm and SkyPort by the Partnership. As the Partnership is capitalized with subscriptions for Class A Limited Partners' interests, Balaton and Watershed will assign to the Partnership rights to participate under the agreements described in Exhibit B. By applying the Class A Limited Partners Capital Contributions in exercise of the rights offered by such agreements, the Partnership will acquire ownership of SkyComm common stock and securities of SkyComm convertible into SkyComm common stock. If the maximum aggregate initial Class A Limited Partners' Capital Contributions of US $ 10,000,000 are completed, Balaton and Watershed will assign all of their participation rights in the Exhibit B agreements to the Partnership and the Partnership will acquire stock representing approximately 76% percent of the issued and outstanding shares of SkyComm, together with common stock *465 purchase warrants which, if exercised by the Partnership, would increase its fully-diluted ownership position to 82%, excluding any dilution resulting from further recapitalization of SkyComm. If less than the maximum aggregate initial Class A Limited Partners' Capital Contributions of US $ 10,000,000 are completed, the Partnership's participation in the acquisition and re-structuring of SkyComm will be proportionately reduced and Balaton and Watershed may retain any participation rights which have not been assigned to the Partnership.
(Emphasis added.)
Pouliot explained that when he signed the ClearSky Limited Partnership Agreement, Kubbernus again told him that the purpose of ClearSky was to acquire, or own, SkyComm and SkyPort. And at the closing of the SkyPort transaction, ClearSky would become the owner of SkyComm and SkyPort. Pouliot explained that he was never told that a scenario existed wherein ClearSky would not obtain ownership of SkyComm and SkyPort. And if he had been told that there was a possibility that his company, a ClearSky Investor, and ClearSky, would not receive anything in exchange for the money that his company had invested in ClearSky, then he would not have invested with appellants.
In regard to the closing of the SkyPort transaction, Pouliot noted that, ultimately, the ClearSky Investors invested $ 7 million in ClearSky, and on November 2, 2006, the SkyPort transaction closed in Houston, Texas. After closing, Pouliot continued to receive communications from Kubbernus, including representations from him that ClearSky, by virtue of the SkyPort transaction, owned CenturyTel's debentures and the 133 million shares of SkyComm common stock. In fact, in every communication received from appellants after closing, Pouliot was led to believe that the SkyPort transaction "had occurred as per the Confidential Information Memorandum." Kubbernus affirmatively told Pouliot that ClearSky was the "new owner" of SkyComm and SkyPort. And he did not disclose to Pouliot that ClearSky had not purchased CenturyTel's debentures and the 133 million shares of SkyComm common stock, but rather he repeatedly confirmed that "ClearSky w[as] now the shareholder of SkyComm."
In August 2009, Pouliot first became aware that ClearSky did not have any ownership interest in SkyComm and SkyPort; Balaton had never assigned any of its interests or rights in SkyComm and SkyPort to ClearSky; and Balaton, using the ClearSky Investors' money, had purchased CenturyTel's debentures and the 133 million shares of SkyComm common stock at the closing of the SkyPort transaction. In fact, Kubbernus, while testifying during the second bankruptcy proceeding, specifically stated that ClearSky and the ClearSky Investors had "absolutely no interest" in SkyComm and SkyPort and "no right whatsoever to any of the shares" of SkyComm common stock. He further told the bankruptcy court that because the ClearSky Investors did not invest $ 10 million in ClearSky, but instead invested only $ 7 million, they "never had [any] shares" and were entitled to "nothing" in regard to SkyComm and SkyPort.
Pouliot further testified that the ClearSky Investors' main complaint about the SkyPort transaction and appellants' actions surrounding the SkyPort transaction was that the ClearSky Investors' money was supposed to be used by ClearSky to purchase CenturyTel's debentures and the 133 million shares of SkyComm common stock, and appellants falsely represented to the ClearSky Investors that ClearSky "would be the owner" of CenturyTel's debentures *466 and the 133 million shares of common stock upon the closing of the SkyPort transaction. In other words, appellants "stole[ ]" the ClearSky Investors' money and used that money, in the SkyPort transaction, to acquire CenturyTel's debentures and the 133 million shares of SkyComm common stock for themselves, leaving the investors without their money or ownership of SkyComm and SkyPort. Further, because of the "fraudulent appropriation" of the ClearSky Investors' money by appellants, the ClearSky Investors "lost the[ir] money" and did not receive anything in return for the $ 7 million that they had invested in ClearSky.
Franklin Craig, a private investor who "put[s] together syndicates and business deals," testified that he raised $ 8 million related to the SkyPort transaction from his investors, who consisted of certain ClearSky Investors, Additional Investors, and Lavell Investors.[31] Craig explained that he learned of the investment opportunity related to SkyComm and SkyPort from Kubbernus, he spoke with Kubbernus directly, and Kubbernus actually met with his investors.
In regard to the ClearSky Investors, Craig received, as did his investors, the Confidential Investment Memorandum, which explained that the purpose of ClearSky was to raise money from investors for the purchase of SkyComm and SkyPort, with the goal being for the ClearSky Investors to invest between $ 1 million and $ 10 million.[32] Craig explained that the memorandum stated, "in black and white," that following the SkyPort transaction, ClearSky would own SkyComm and SkyPort. He also received a copy of the ClearSky Limited Partnership Agreement and the ClearSky Subscription Agreement,[33] as *467 did his investors. And Craig's investors relied on the statements contained in these agreements and in the Confidential Investment Memorandum when they decided to invest about $ 500,000 in ClearSky.[34]
In regard to the Additional Investors, Craig explained that Kubbernus telephoned him to discuss adding new investors. Kubbernus and the "SkyPort team" then met with the Additional Investors and presented them with an opportunity to invest their money directly in SkyComm.[35] According to Craig, the Additional Investors invested money directly into SkyComm, and they did so based on the documentation provided to them by appellants. In exchange for their investment, the Additional Investors were to receive shares of SkyComm common stock.
In regard to the Lavell Investors, Craig explained that Lavell was a Canadian Company "set up by Balaton" to "be a vehicle [by] which all of the ... SkyComm/SkyPort/ClearSky [I]nvestors" could "exchange their [SkyComm] shares and receive shares of Lavell, which was supposed to be listed on the Toronto Stock Exchange." "[A] couple" of Craig's investors invested their money in Lavell, and in exchange for their investment, the Lavell Investors received "a note," which was never paid. And Craig did not "know where the Lavell money" had gone.[36]
According to Craig, none of his investors, i.e., the ClearSky Investors, the Additional Investors, and the Lavell Investors, received anything in exchange for the money that they had invested. He was asked what was the "main ... thing" that appellants did wrong from the perspective of the ClearSky Investors. And he responded that appellants used the ClearSky Investors' money in the SkyPort transaction, but ClearSky did not acquire CenturyTel's debentures or the 133 million shares of SkyComm common stock.
Further, in regard to the Additional Investors and the Lavell Investors, Craig explained that appellants never told them that the ClearSky Investors, "who funded" the SkyPort transaction, actually received "nothing" in exchange for the money that they had invested.[37] Instead, appellants told the Additional Investors and the Lavell *468 Investors that the ClearSky Investors owned shares, were "happy," and had received what they had been promised, and the Additional Investors and the Lavell Investors "should invest just like the[ ] [ClearSky Investors] did." And if the Additional Investors and the Lavell Investors had known the "the truth" about what had occurred with the ClearSky Investors' money, then they "would have never invested and would never have lost [their money]." In other words, if the Additional Investors and the Lavell Investors "had known that ... shares [had not] be[en] given to the people that [had] put their hard money up," i.e., the ClearSky Investors, then they would not have invested their money with appellants.[38]
Kubbernus testified[39] that he was previously a shareholder, and involved in the formation, of Balaton, a company that specialized in "[d]istress situations." When he first learned of the opportunity with SkyComm and SkyPort, they were "in deep trouble" financially, and CenturyTel, at the time, did not want to continue its funding of SkyPort. Soon thereafter, SkyComm and SkyPort filed for bankruptcy protection, and Kubbernus saw the bankruptcy proceeding as an opportunity to "clean up" some of their business contracts and make them profitable. After SkyComm and SkyPort emerged from bankruptcy, appellants aided them in raising capital, making decisions, and rebuilding their business.
On February 10, 2006, appellants formed ClearSky as "an investment vehicle," and the ClearSky Investors invested $ 7 million in it. According to Kubbernus, the ClearSky Investors were given the Confidential Investment Memorandum, prepared by Balaton, prior to them making their decisions to invest their money in ClearSky. And appellants intended for the ClearSky Investors to rely on the Confidential Investment Memorandum when making their decisions to invest in ClearSky.[40] Kubbernus conceded that the Confidential Investment Memorandum informed the ClearSky Investors that ClearSky would acquire ownership of SkyComm and SkyPort as part of the SkyPort transaction; ClearSky would purchase the 133 million shares of SkyComm common stock; and Balaton would assign any of its rights under the SPA and DPA to ClearSky.
Kubbernus further explained that the Confidential Investment Memorandum did not tell the ClearSky Investors that ClearSky might acquire only some of Balaton's interests in SkyComm and SkyPort "maybe someday"; Balaton would use the ClearSky Investors' money for itself and ClearSky "might or might not" obtain any interest in SkyComm and SkyPort; if the ClearSky Investors did not invest $ 10 million in ClearSky, then ClearSky would receive "nothing," i.e., no ownership of SkyComm and SkyPort; and appellants could cancel ClearSky's "economic interest" in SkyComm and SkyPort at any time without notice.
Kubbernus noted that once the ClearSky Investors had decided to invest their money in ClearSky, each investor signed the ClearSky Subscription Agreement, in which they affirmed that they had read the Confidential Investment Memorandum and the ClearSky Limited Partnership Agreement and relied on the information contained *469 in them when deciding to invest their money in ClearSky.
Kubbernus further testified that despite the representations made in the Confidential Investment Memorandum, appellants never intended for ClearSky to obtain ownership of SkyComm and SkyPort or acquire CenturyTel's debentures and the 133 million shares of SkyComm common stock when the SkyPort transaction closed. Rather, appellants always intended for Balaton to purchase CenturyTel's debentures and the 133 million shares of SkyComm common stock at closing. However, Kubbernus admitted that appellants actually used the $ 7 million of the ClearSky Investors' money so that Balaton could purchase, for itself, CenturyTel's debentures and the 133 million shares of SkyComm common stock.
Kubbernus explained that ClearSky did not ever obtain ownership rights to SkyComm and SkyPort, and it did not acquire CenturyTel's debentures or the 133 million shares of SkyComm common stock.[41] Instead, according to Kubbernus, ClearSky "ended up" with "[a] [d]ifferent economic interest than what[ ] [had been] represented" by appellants to the ClearSky Investors in the Confidential Investment Memorandum. Specifically, as a result of the SkyPort transaction, ClearSky merely received "an interest in acquiring ... stock" at some point in the future.[42]
In regard to the SkyPort transaction, Kubbernus testified that, under the SPA, SkyComm was to receive $ 4 million in exchange for the 133 million shares of its common stock. And under the DPA, CenturyTel was to sell its convertible debentures to Balaton for $ 3 million. At the time that the SPA and the DPA were signed on February 15, 2006, Kubbernus never intended for ClearSky or the ClearSky Investors to become a party to those agreements. And he never, at any time, intended for ClearSky to "buy[ ]" SkyComm and SkyPort. When the SkyPort transaction closed in November 2006, Kubbernus told CenturyTel to sell its debentures to Balaton, and he told SkyComm to sell its 133 million shares of common stock to Balaton.
Kubbernus further admitted that Balaton actually used the ClearSky Investors' money to purchase CenturyTel's debentures and the 133 million shares of SkyComm common stock, but Balaton never assigned any of its rights in SkyComm or SkyPort to ClearSky. ClearSky was also never added as a purchaser of securities under either the SPA or the DPA. And Kubbernus could not recall whether, before *470 the second bankruptcy proceeding in August 2009, he had ever disclosed to the ClearSky Investors that ClearSky did not receive CenturyTel's debentures or the 133 million shares of SkyComm common stock, even though the ClearSky Investors' money was used to complete the SkyPort transaction.[43]
Finally, Kubbernus testified that appellants never submitted an application to the FCC to obtain approval for ClearSky to purchase SkyComm and SkyPort. And he conceded that he had never told the ClearSky Investors that FCC approval would not be sought, and had not been sought, on ClearSky's behalf. And although, before Pouliot had invested his company's money in ClearSky, Kubbernus sent Pouliot an email in which he stated that FCC approval for ClearSky's ownership of SkyComm and SkyPort would be sought, appellants never actually sought such approval. Instead, appellants submitted an FCC application, subsequently approved by the FCC, stating: "This application seeks [the] Commission['s] consent for [the] transfer of control of SkyPort International, Inc. from CenturyTel, Inc. to Balaton Group Inc."
Brogan Taylor ("Brogan")[44] testified that he previously worked for Balaton and, as an employee, he became involved with the SkyPort transaction in December 2005. In February 2006, ClearSky was created in order to raise capital for the SkyPort transaction. Each ClearSky Investor was given the Confidential Investment Memorandum, which "outline[d] the whole purpose of" the creation of ClearSky, "outlined the entire deal," and "promise[d] ownership [of SkyComm and SkyPort] to the ClearSky [I]nvestors." According to Brogan, appellants knew that the ClearSky Investors "had been told that they would own ... stock" in SkyComm and SkyPort, and the memorandum was never changed to reflect that Balaton, and not ClearSky, would be acquiring ownership of SkyComm and SkyPort when the SkyPort transaction closed. Brogan later discovered that the representations made by appellants related to ClearSky acquiring ownership of SkyComm and SkyPort were untrue.[45] And the ClearSky Investors were never told that the terms of the SkyPort transaction had ever changed. Ultimately, although the ClearSky Investors' money was used to purchase CenturyTel's debentures and the 133 million shares of SkyComm common stock, Balaton became the owner of those securities.
Brogan further explained that FCC approval was necessary before the SkyPort transaction could close. The FCC application, filed on April 4, 2006, requested the transfer of control of SkyComm and SkyPort from CenturyTel to Balaton. And no application was ever submitted to the FCC seeking approval of ClearSky as the owner of SkyComm and SkyPort.
In regard to the SPA and the DPA, Brogan characterized the agreements as the "two main deal documents," and he noted that ClearSky was never added to *471 either agreement, even though the SPA allowed for the ClearSky Investors or ClearSky to be added. Instead, the SPA and DPA showed Balaton as the entity acquiring CenturyTel's debentures and the 133 million shares of SkyComm common stock. Brogan knew at the time of closing that the debentures and the shares of SkyComm common stock were being issued in Balaton's name; however, it was the ClearSky Investors' money that was actually used to purchase the 133 million shares of SkyComm common stock at the closing of the SkyPort transaction.
In regard to the Additional Investors and the Lavell Investors, Brogan testified that after the closing of the SkyPort transaction, Balaton was involved in selling shares of SkyComm common stock to investors, outside of ClearSky, at a higher price. Brogan also noted that he represented to Craig that ClearSky's shares of SkyComm common stock, i.e., the 133 million shares of SkyComm common stock, were being held in a trust for ClearSky because that is what Kubbernus had told him.
In regard to Kubbernus, Brogan opined that he had "no character for truthfulness," and he had "experienced him lying firsthand to investors of ClearSky and to ... [other] individuals."
The jury found that appellants had committed, against the ClearSky Investors, the Additional Investors, and the Lavell Investors, securities violations under the TSA.[46] And it awarded damages to appellees.[47] After a hearing on attorney's fees, the trial court entered judgment in favor of appellees on their securities-violations claims, awarding them damages and attorney's fees under the TSA.
Applicability of Texas Securities Act
In a portion of their first issue, appellants argue that certain appellees are prohibited from bringing claims for securities violations under the TSA because the TSA does not apply extraterritorially; only one *472 appellee is a Texas citizen; certain appellees constitute "foreign plaintiffs"[48] ; and "foreign plaintiffs" cannot bring suit under the TSA "because the operative facts of their claims are not connected to Texas." In doing so, appellants assert that "[t]he test in ... section [148(2) ] of the Restatement [ (Second) Conflict of Laws]" "determine[s] whether a plaintiff can assert a claim under the TSA." See RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 148(2).
We note that section 148(2)[49] is relevant to a choice-of-law analysis. See Petroleum Workers Union of the Republic of Mex. v. Gomez , 503 S.W.3d 9, 32 (Tex. App.-Houston [14th Dist.] 2016, no pet.) (typically Texas courts resolve issue of whether Texas law applies under principles enunciated in Restatement (Second) of Conflict of Laws); Highland Crusader Offshore Partners, L.P. v. Motient Corp. , 281 S.W.3d 237, 249-252 (Tex. App.-Dallas 2009, pet. denied) ; GJP, Inc. v. Ghosh , 251 S.W.3d 854, 884 (Tex. App.-Austin 2008, no pet.) ; Grant Thornton LLP v. Suntrust Bank , 133 S.W.3d 342, 357-58 (Tex. App.-Dallas 2004, pet. denied) (conducting choice-of-law analysis where defendant asserted TSA did not apply to non-Texas residents); Vanderbilt Mortg. & Fin., Inc. v. Posey , 146 S.W.3d 302, 315 (Tex. App.-Texarkana 2004, no pet.).
A choice of which state's law should apply to a particular case is a question of law that we review de novo. See Torrington Co. v. Stutzman , 46 S.W.3d 829, 848 (Tex. 2000) ; In re Chestnut Energy Partners, Inc. , 300 S.W.3d 386, 398 (Tex. App.-Dallas 2009, pet. denied) ;
*473 Pittsburgh Corning Corp. v. Walters , 1 S.W.3d 759, 769 (Tex. App.-Corpus Christi 1999, pet. denied). Choice of law issues can be waived if not properly invoked. Gen. Chem. Corp. v. De La Lastra , 852 S.W.2d 916, 919 (Tex. 1993) ; DaimlerChrysler Motors Co. v. Manuel , 362 S.W.3d 160, 196-97 (Tex. App.-Fort Worth 2012, no pet) ; see also Coca-Cola Co. v. Harmar Bottling Co. , 218 S.W.3d 671, 695 (Tex. 2006) (Brister, J., dissenting) (choice-of-law issues, unlike jurisdictional issues, can be waived). Under Texas Rule of Evidence 203, a party intending to raise an issue concerning foreign law must give notice in the pleadings or "other reasonable written notice," and at least thirty days before trial, furnish to all parties copies of any written materials or sources that the party intends to use as proof of the foreign law. TEX. R. EVID. 203 ; PennWell Corp. v. Ken Assocs., Inc. , 123 S.W.3d 756, 760 (Tex. App.-Houston [14th Dist.] Dec. 11, 2003, pet. denied). In other words, a preliminary motion is necessary to assure the application of the laws of another jurisdiction. Walters , 1 S.W.3d at 769.
Here, appellants argue that the TSA is not applicable to certain appellees' security-violations claims because these appellees are not Texas residents and "none of the factors [listed in section 148(2) ] point to Texas [law]." See RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 148(2). However, appellants did not raise their choice-of-law complaint before trial, in a motion or otherwise, and did not object to the trial court's submission to the jury of appellees' claims for securities violations under the TSA. See Gen. Chem. Corp. , 852 S.W.2d at 920 (holding party waived application of maritime law to case "by failing to object to evidence and jury questions regarding damages which are not recoverable under maritime law"); DaimlerChrysler Motors , 362 S.W.3d at 196-97 ; Bob Montgomery Chevrolet, Inc. v. Dent Zone Cos. , 409 S.W.3d 181, 188 n.3 (Tex. App.-Dallas 2013, no pet.) ; Burlington N. & Santa Fe Ry. Co. v. Gunderson, Inc. , 235 S.W.3d 287, 290 (Tex. App.-Fort Worth 2007, pet. withdrawn) (holding trial court permitted to presume Texas and other state's law similar because party failed to file motion); Great N. Am. Stationers, Inc. v. Ball , 770 S.W.2d 631, 632-33 (Tex. App.-Dallas 1989, writ dism'd) (choice-of-law issue waived when first raised on appeal). And to the extent that appellants assert that they preserved their choice-of-law issue through their motion for judgment notwithstanding the verdict ("JNOV"), they did not. See DaimlerChrysler , 362 S.W.3d at 196-97 (post-trial motion raising choice-of-law issue untimely and did not preserve complaint). Accordingly, we hold that appellants have waived their choice-of-law complaint under Restatement (Second) of Conflict of Laws section 148(2).
We note that appellants, in their reply brief, assert that they are not raising a choice-of-law issue, but instead, they are actually asserting that certain appellees, who constitute "foreign plaintiffs," do not have standing to sue under the TSA-an issue that may be raised for the first time on appeal.[50] See Tex. Ass'n of Bus. v. Tex. Air Control Bd. , 852 S.W.2d 440, 443-44 (Tex. 1993). Appellants argue that such appellees cannot assert claims for securities violations under the TSA because "such ... claim[s] would involve an improper extraterritorial application of Texas law." In support of their argument, appellants rely exclusively on Coca-Cola .
In Coca-Cola , five carbonated soft drink bottlers with franchises to distribute Royal *474 Crown Cola in various territories "within the Ark-La-Tex region" brought suit against The Coca-Cola Company and several distributors of Coca-Cola and Dr. Pepper for violations of the Texas Free Enterprise and Antitrust Act of 1983 ("TFEAA") and the antitrust laws of other states. 218 S.W.3d at 674. On appeal, the Texas Supreme Court addressed whether Texas courts could adjudicate and remedy an anticompetitive injury occurring in another state under the TFEAA. Id. In other words, the supreme court sought to address "the reach of the TFEAA." Id. at 680. Ultimately, the court held that "the TFEAA [did] not support extraterritorial relief in the absence of a showing that such relief promotes competition in Texas or benefits Texas consumers." Id. at 674-75.
Notably, the supreme court confined its holding in Coca-Cola to the TFEAA, and in doing so, focused on the policy considerations implicated by the extraterritorial application of antitrust laws and the fact that the Texas legislature did not intend for the TFEAA to apply to anticompetitive effects outside of Texas. Id. at 682-83. The court concluded that the purpose of the TFEAA was to promote competition in Texas, Texas had no interest in preventing anticompetitive effects in other states, and other states' regulation of competition within their own borders would be impeded and interfered with if the TFEAA was held to apply. Id. Coca-Cola is inapplicable to the instant case.[51]
However, we note that in Citizens Insurance Co. of America v. Daccach , the Texas Supreme Court considered whether the TSA's registration requirements could apply extraterritorially to claims based on securities sold to non-Texas residents. 217 S.W.3d 430, 435, 439-40 (Tex. 2007). There, the plaintiffs, who resided in over thirty-five countries, alleged that the defendants, Colorado corporations with their principal places of business in Austin, Texas, violated the TSA by offering or selling securities without registering with the Texas Securities Board. Id. ; see TEX. REV. CIV. STATS. ANN. arts. 581-12(A), 581-33(A)(1) (Vernon 2010). The supreme court, in deciding whether the TSA applied, explained that its primary consideration was "under principles of statutory interpretation, whether the ... defendants' actions ... constitute conduct [that] the [Texas] [l]egislature intended to regulate." Daccach , 217 S.W.3d at 442. Ultimately, the court concluded that the legislature intended for the TSA's registration provisions to prohibit the unregistered sale of securities from Texas, even when the purchasers of those securities were non-Texas residents. Id. at 446.[52]
The supreme court, in reaching its conclusion, looked to the Uniform Securities Act of 1956, on which the TSA was substantially based, explaining that a particular state's laws should apply to a transaction if the "wrongful acts in the transaction occurred" in that particular state. Id. at 445. And the court noted that the purpose of the TSA's article 581-33, the provision under which appellees brought their securities-violations claims in the instant case, was "to indemnify investors victimized by violations of the [TSA], encourage compliance with the [TSA]'s regulatory and disclosure provisions, and create incentives *475 for its private enforcement." Id. at 444. Further, the court stated that "[g]iven the nature of securities transactions, achieving the[ ] [TSA's] purposes w[ould] ultimately require that the [TSA] apply to situations that involve some out-of-state activities...." Id. Although the specific TSA liability provision in article 581-33 that was at issue in Daccach is not the same TSA liability provision at issue in the instant case, Daccach provides a strong indication that the Texas legislature intended the TSA to apply to transactions emanating from Texas, even when they involve non-Texas residents. See Janvey v. Willis of Colo. Inc. , No. 3:13-CV-3980-N, 2014 WL 12670763, at *8-9 (N.D. Tex. Dec. 5, 2014).
We further note that this Court has previously considered an argument similar to that of appellants in the instant case, i.e., that the TSA does not apply to securities sales made to residents of other states. See Rio Grande Oil Co. v. State , 539 S.W.2d 917, 921-22 (Tex. Civ. App.-Houston [1st Dist.] 1976, writ ref'd n.r.e.). In that case, we concluded that "[t]he provisions of the [TSA] are broad" and "it [is] clear that the [TSA] applies if any act in the selling process of securities covered by the [TSA] occurs in Texas." Id. ; see also Enntex Oil & Gas Co. (of Nev.) v. State , 560 S.W.2d 494, 497 (Tex. Civ. App.-Texarkana 1977, writ ref'd n.r.e.) ("It is obvious from an examination of the ... [TSA] and the holdings in ... cases that the [TSA] applies to appellants and their sales activities even though the purchasers, who are not regulated by the [TSA], [are] non-residents of the State of Texas.").
Additionally, federal courts have come to the same conclusion when analyzing the applicability of the TSA to claims brought by non-Texas residents. For instance, in Baron v. Strassner , the plaintiffs brought suit under the TSA,[53] alleging that the defendants misrepresented material information about the financial condition of a corporation in connection with an initial public offering of that corporation's stock. 7 F.Supp.2d 871, 872 (S.D. Tex. 1998). Upon removal to federal court, defendants argued that plaintiffs had no legitimate or viable cause of action under the TSA because it "c[ould not] be applied extraterritorially to transactions that occurred outside Texas by non-Texas residents." Id. at 874 (internal quotations omitted). The court, however, disagreed, explaining that "[t]here is nothing in the [TSA] itself, or in the civil liability provisions that [p]laintiffs rely upon[, i.e., subsections 581-33(A)(2) and (C)(2),]" which would prevent the TSA from "protect[ing] non-Texas residents from fraudulent securities practices emanating from Texas." Id. at 875 ; see also Silvercreek Mgmt., Inc. v. Citigroup, Inc. , 248 F.Supp.3d 428, 456 (S.D.N.Y. 2017) ; In re Enron Corp. Sec., Derivative & ERISA Litig. , 235 F.Supp.2d 549, 691-92 (S.D. Tex. 2002) (TSA "is a broad remedial statute intended not only to protect Texas residents but also non-Texas residents from fraudulent securities practices emanating from Texas" (internal quotations omitted)).
We note that SkyPort is a Texas corporation and SkyComm, a Delaware corporation, was formed solely to be a holding company for SkyPort. SkyComm, "through its wholly-owned subsidiary, SkyPort ..., is primarily engaged in the business of operating a satellite services company." And SkyComm "conducts substantially all of its operations through its wholly-owned subsidiary, SkyPort." The principle offices and activities of SkyComm and SkyPort are in Houston, Texas, and Houston is the focal point of SkyComm's *476 and SkyPort's business. Further, the securities at issue in this case, namely CenturyTel's debentures and the 133 million shares of SkyComm common stock are Texas-based securities, and the pertinent agreements related to the acquisition of those securities were executed in Texas and are governed by Texas law. Although ClearSky is a Delaware limited partnership, it was "formed for the [exclusive] purpose of acquiring control of SkyPort ... through its parent corporation, SkyComm." And the closing of the SkyPort transaction occurred in Houston, Texas. Moreover, appellants marketed the ClearSky investment opportunity in Texas, several appellees traveled to Texas, and appellants solicited the investment monies of appellees in Texas-a fact that Kubbernus admitted at trial. As previously explained, the TSA is intended to apply to transactions emanating from Texas, even when they involve non-Texas residents. See Daccach , 217 S.W.3d at 446 ; Rio Grande Oil , 539 S.W.2d at 921-22 ; see also Baron , 7 F.Supp.2d at 875.
We conclude that appellants' purported "standing" argument is without merit. Accordingly, we hold that the TSA is applicable to the instant case and appellees were not prohibited from bringing claims against appellants for securities violations under the TSA.
We overrule this portion of appellants' first issue.
Statute of Repose
In a portion of their first issue, appellants argue that the claims of certain appellees for securities violations under the TSA are barred by its statute of repose because "no claim can be made [under the TSA] more than five years after the underlying sale" of the securities at issue.[54] See TEX. REV. CIV. STAT. ANN. art. 581-33(H)(2)(b). In response, appellees assert that appellants have waived their statute-of-repose defense.
The TSA's "[s]tatute of [l]imitations" provision provides that "[n]o person may sue under" article 581-33(A)(2), as appellees did in the instant case, "more than five years after the sale" of the securities at issue. See id. ; see also Pitman v. Lightfoot , 937 S.W.2d 496, 528 (Tex. App.-San Antonio 1996, writ denied) ("The limitations period for claims under the [TSA] is found in article 581-33(H).... [A] claim under the [TSA] may 'in no event' be made more than five years after the sale.") (quoting Williams v. Khalaf , 802 S.W.2d 651, 654 n.3 (Tex. 1990) ). Despite being titled a "[s]tatute of [l]imitations," this TSA provision has generally been characterized as a statute of repose.[55] See F.D.I.C. v. RBS Sec. Inc. , 798 F.3d 244, 247 (5th Cir. 2015) ("[T]he [TSA] imposes a 'statute of limitations,' characterized as a statute of repose, of five years from the date the securities at issue were sold.");
*477 In re Countrywide Fin. Corp. Mortg.-Backed Sec. Litig. , 966 F.Supp.2d 1018, 1023-24 (C.D. Cal. 2013) ("Texas state courts have treated the five-year limitation under the TSA as a statute of repose."); see also Williams , 802 S.W.2d at 654 n.3 ; Allen v. Devon Energy Holdings, L.L.C. , 367 S.W.3d 355, 401 (Tex. App.-Houston [1st Dist.] 2012, pet. granted, judgm't vacated w.r.m.) ; but see Arnold v. Life Partners, Inc. , 416 S.W.3d 577, 591 (Tex. App.-Dallas 2013) (characterizing provision as five-year statute of limitations), aff'd , 464 S.W.3d 660 (Tex. 2015).
A statute of repose operates as an affirmative defense that must be pleaded and proven by a defendant. See TEX. R. CIV. P. 94 ; Fed. Deposit Ins. Corp. v. Lenk , 361 S.W.3d 602, 609 (Tex. 2012) ; Ryland Grp., Inc. v. Hood , 924 S.W.2d 120, 121 (Tex. 1996) ; Nexen Inc. v. Gulf Interstate Eng'g Co. , 224 S.W.3d 412, 416 (Tex. App.-Houston [1st Dist.] 2006, no pet.). And an affirmative defense, such as statute of repose, that is not pleaded is waived. See TEX. R. CIV. P. 94 ; DeClaire v. G & B McIntosh Family Ltd. P'ship , 260 S.W.3d 34, 48 (Tex. App.-Houston [1st Dist.] 2008, no pet.) ; see also Epps v. Fowler , 351 S.W.3d 862, 869 n.8 (Tex. 2011).
Here, appellants did not raise their affirmative defense of statute of repose until their First Amended Answer, filed shortly before trial.[56] Appellees objected, and moved to strike appellants' amended answer in which they asserted numerous affirmative defenses, including statute of repose, for the first time. The trial court granted appellees' motion, in part, striking, among others, appellants' statute-of-repose defense.
When a trial court strikes an affirmative defense that was previously pleaded by a defendant, the defendant has essentially failed to plead his defense, and it is waived. See G.R.A.V.I.T.Y. Enters., Inc. v. Reece Supply Co. , 177 S.W.3d 537, 544 (Tex. App.-Dallas 2005, no pet.) (holding limitations defense waived because once party's pleading struck, "it had no pleading asserting the affirmative defense of limitations"); Brantley v. Etter , 662 S.W.2d 752, 757 (Tex. App.-San Antonio 1983, writ ref'd n.r.e.) ; see also Petroleum Sols., Inc. v. Head , 454 S.W.3d 518, 545-46 (Tex. App.-Corpus Christi 2011) (limitations defense waived where although defendant pleaded defense, trial court struck defense in sanctions order), aff'd in part, rev'd in part , 454 S.W.3d 482 (Tex. 2014) ; Ford Motor Co. v. Ozuna , No. 04-98-00957-CV, 2000 WL 4544, at *4 (Tex. App.-San Antonio Nov. 30, 1999, no pet.) (not designated for publication) (affirmative defense waived where pleaded only in amended answer, which trial court struck); Assicurazioni Generali, S.p.A. v. Milsap , 760 S.W.2d 314, 317 (Tex. App.-Texarkana 1988, writ denied) (when defendant's pleading struck, there is no pleading). Here, the trial court struck appellants' statute-of-repose affirmative defense, and it is, thus, waived.
We note that in their reply brief, appellants argue that they have preserved their statute-of-repose affirmative defense because they raised it in their First Motion for Partial Summary Judgment and in their motion for JNOV.
In appellants' First Motion for Partial Summary Judgment, they asserted that the ClearSky Investors' and the Lavell *478 Investors' "[r]egistration [c]laims" are time-barred under the TSA's three-year statute of limitations provided for in TSA article 581-33(H)(1). See TEX. REV. CIV. STAT. ANN. art. 581-33(H)(1) (providing "[n]o person may sue under [s]ection 33A(1) ... more than three years after the sale" of securities at issue). However, appellees did not bring "[r]egistration [c]laims" against appellants in the instant case or any other claims that would make the TSA's three-year statute-of-limitations provision found in article 581-33(H)(1) applicable. Notably, appellants did not assert in their First Motion for Partial Summary Judgment that appellees' securities-violations claims are barred by TSA article 581-33(H)(2)(b) 's five-year statute-of-repose.[57] See id. art. 581-33(H)(2)(b).
In regard to appellants' motion for JNOV, we note that a defendant, who has not pleaded the affirmative defense of statute of repose, waives that defense by waiting to raise it until his post-trial motion for JNOV. See MAN Engines & Components, Inc. v. Shows , 434 S.W.3d 132, 136 (Tex. 2014) (" Rule 94 makes clear that affirmative defenses must be properly raised in pretrial proceedings...."); Khoury v. Tomlinson , 518 S.W.3d 568, 583 (Tex. App.-Houston [1st Dist.] 2017, no pet.) (in case involving TSA, defendant waived statute-of-limitations affirmative defense by not pleading defense and not raising it until motion for JNOV); Castillo v. Neely's TBA Dealer Supply, Inc. , 776 S.W.2d 290, 292-94 (Tex. App.-Houston [1st Dist.] 1989, writ denied) ; Morris Cty. Tax Appraisal Dist. v. Nail , 708 S.W.2d 473, 474 (Tex. App.-Texarkana 1986, writ ref'd n.r.e.) (defendant waived statute-of-limitations affirmative defense where it "did not plead the defense in any of its pleadings, and raised it for the first time in its motion for [JNOV]").
Accordingly, we hold that appellants have waived their statute-of-repose affirmative defense and their argument on appeal that certain appellees' claims for securities violations are barred by the TSA's five-year statute of repose. See TEX. R. CIV. P. 94 ; Fed. Deposit Ins. , 361 S.W.3d at 609 ("[A]s an affirmative defense, the statute of repose is only available to parties that properly raise it in the trial court."); see also TEX. REV. CIV. STAT. ANN. art. 581-33(H)(2)(b).
Sufficiency of Evidence
In a portion of their first issue, appellants argue that the evidence is legally and factually insufficient to support the jury's findings in favor of appellees on their claims for securities violations under the TSA because there is no evidence of any material untruth or omission or that "the damages awarded to [appellees] were proximately caused by [any] untruth or omission."
When, as here, appellants attack the legal sufficiency of an adverse finding on an issue on which they did not have the burden of proof, they must demonstrate that no evidence supports the finding. Examination Mgmt. Servs., Inc. v. Kersh Risk Mgmt., Inc. , 367 S.W.3d 835, 839 (Tex. App.-Dallas 2012, no pet.). We will sustain a legal sufficiency or "no-evidence" challenge if the record shows any one of the following: (1) a complete absence of evidence of a vital fact, (2) rules of *479 law or evidence bar the court from giving weight to the only evidence offered to prove a vital fact, (3) the evidence offered to prove a vital fact is no more than a scintilla, or (4) the evidence establishes conclusively the opposite of the vital fact. City of Keller v. Wilson , 168 S.W.3d 802, 810 (Tex. 2005). In conducting a legal-sufficiency review, we consider the evidence in the light most favorable to the verdict and indulge every reasonable inference that supports it. Id. at 822. The term "inference" means,
[i]n the law of evidence, a truth or proposition drawn from another which is supposed or admitted to be true. A process of reasoning by which a fact or proposition sought to be established is deduced as a logical consequence from other facts, or a state of facts, already proved....
Marshall Field Stores, Inc. v. Gardiner , 859 S.W.2d 391, 400 (Tex. App.-Houston [1st Dist.] 1993, writ dism'd w.o.j.) (internal quotations omitted). "For a jury to infer a fact, it must be able to deduce that fact as a logical consequence from other proven facts." Id.
If there is more than a scintilla of evidence to support the challenged finding, we must uphold it. Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc. , 960 S.W.2d 41, 48 (Tex. 1998). "[W]hen the evidence offered to prove a vital fact is so weak as to do no more than create a mere surmise or suspicion of its existence, the evidence is no more than a scintilla and, in legal effect, is no evidence." Ford Motor Co. v. Ridgway , 135 S.W.3d 598, 601 (Tex. 2004) (internal quotations omitted). However, if the evidence at trial would enable reasonable and fair-minded people to differ in their conclusions, then jurors must be allowed to do so. City of Keller , 168 S.W.3d at 822. "A reviewing court cannot substitute its judgment for that of the trier-of-fact, so long as the evidence falls within th[e] zone of reasonable disagreement." Id.
When appellants attack the factual sufficiency of an adverse finding on an issue on which they did not have the burden of proof, they must demonstrate that the adverse finding is so contrary to the overwhelming weight of the evidence as to be clearly wrong and manifestly unjust. Cain v. Bain , 709 S.W.2d 175, 176 (Tex. 1986). In conducting a factual-sufficiency review, we examine, consider, and weigh all of the evidence that supports or contradicts the fact finder's determination. See Dow Chem. Co. v. Francis , 46 S.W.3d 237, 242 (Tex. 2001) ; Plas-Tex, Inc. v. U.S. Steel Corp. , 772 S.W.2d 442, 445 (Tex. 1989). We note that the jury is the sole judge of the witnesses' credibility, and it may choose to believe one witness over another; a reviewing court may not impose its own opinion to the contrary. See Golden Eagle Archery, Inc. v. Jackson , 116 S.W.3d 757, 761 (Tex. 2003). When presented with conflicting testimony, the fact finder may believe one witness and disbelieve others, and it may resolve inconsistencies in the testimony of any witness. McGalliard v. Kuhlmann , 722 S.W.2d 694, 697 (Tex. 1986). We set aside the verdict only if the evidence is so weak or the finding is so against the great weight and preponderance of the evidence that it is clearly wrong or manifestly unjust. See Dow Chem. Co. , 46 S.W.3d at 242 ; Pool v. Ford Motor Co. , 715 S.W.2d 629, 635 (Tex. 1986).
Material Untruth or Omission
Appellants first assert that the evidence is legally and factually insufficient to establish that they made any material misrepresentations or omissions to appellees.
*480 The TSA establishes a cause of action for misrepresentations or omissions made in connection with a securities transaction. See TEX. REV. CIV. STAT. ANN. art. 581-33(A)(2) ; Duperier v. Tex. State Bank , 28 S.W.3d 740, 745 (Tex. App.-Corpus Christi 2000, pet. dism'd by agr.) ; see also Quest Med., Inc. v. Apprill , 90 F.3d 1080, 1091 (5th Cir. 1996). The fraud provision in TSA article 581-33 is remedial in nature and "should be given the widest possible scope." Tex. Capital Sec., Inc. v. Sandefer , 58 S.W.3d 760, 775 (Tex. App.-Houston [1st Dist.] 2001, pet. denied) (internal quotations omitted); see also Aegis Ins. Holding Co. v. Gaiser , No. 04-05-00938-CV, 2007 WL 906328, at *5 (Tex. App.-San Antonio Mar. 28, 2007, pet. denied) (mem. op.). Specifically, the TSA provides:
A person who offers or sells a security ... by means of an untrue statement of a material fact or an omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading , is liable to the person buying the security from him, who may sue either at law or in equity for rescission, or for damages if the buyer no longer owns the security.
TEX. REV. CIV. STAT. ANN. art. 581-33(A)(2) (emphasis added). Thus, to recover under the TSA, a buyer of a security must prove that the security was sold by means of (1) an untrue statement of material fact or (2) an omission to state a material fact that is necessary in order to make the statements made not misleading. Id. ; Sandefer , 58 S.W.3d at 776 ; see also Crescendo Invs., Inc. v. Brice , 61 S.W.3d 465, 475 (Tex. App.-San Antonio 2001, pet. denied) (plaintiff must introduce evidence of material misrepresentation or omission related to security and induced its purchase).
An omission or misrepresentation is material "if there is a substantial likelihood that a reasonable investor would consider it important in deciding to invest." Sandefer , 58 S.W.3d at 776 (internal quotations omitted); see also Duperier , 28 S.W.3d at 745 ; Weatherly v. Deloitte & Touche , 905 S.W.2d 642, 649 (Tex. App.-Houston [14th Dist.] 1995, writ dism'd w.o.j.). However, an investor is not required to prove that he would have actually acted differently but for the omission or misrepresentation. Sandefer , 58 S.W.3d at 776 ; Weatherly , 905 S.W.2d at 649. The focus of the TSA is on the conduct of the seller or issuer of securities, i.e., whether they made a material misrepresentation or omission, not on the conduct of the buyers. Sandefer , 58 S.W.3d at 776 ; Weatherly , 905 S.W.2d at 649 ; see also Gaiser , 2007 WL 906328, at *5 ("The TSA is to be construed to protect investors."); Duperier , 28 S.W.3d at 745 (statute merely requires proof of misrepresentation or omission by seller). Generally, statements of opinion, including opinions regarding the value of the securities, are not actionable under TSA article 581-33(A)(2). Sandefer , 58 S.W.3d at 776 ("puffing" or "dealers' talk," such as prediction of increased share price, generally not actionable misrepresentation); Duperier , 28 S.W.3d at 749 ; Paull v. Capital Res. Mgmt., Inc. , 987 S.W.2d 214, 218-19 (Tex. App.-Austin 1999, pet. denied) (characterization of investment as "low risk" and prediction of "large revenues for a long time" constituted statements of opinion not actionable under fraud provision of TSA where investors had equal access to information on which opinions based (internal quotations omitted)).
As previously noted, because appellants attack the legal sufficiency of an adverse finding on an issue on which they did not have the burden of proof, they must demonstrate that no evidence supports the finding. Examination Mgmt. Servs. , 367 S.W.3d at 839. And because appellants attack *481 the factual sufficiency of an adverse finding on an issue on which they did not have the burden of proof, they must demonstrate that the adverse finding is so contrary to the overwhelming weight of the evidence as to be clearly wrong and manifestly unjust. Cain , 709 S.W.2d at 176.
In regard to the ClearSky Investors, Pouliot testified that Kubbernus, related to the structure of the SkyPort transaction, told him that a group of investors, the ClearSky Investors would invest money in a limited partnership, i.e., ClearSky, with the goal of raising $ 10 million. The money invested in ClearSky by the ClearSky Investors would then be used for two purposes related to acquiring ownership of SkyComm and SkyPort. First, $ 3 million of the ClearSky Investors' money would be used by ClearSky to purchase CenturyTel's debentures, which ClearSky would convert into 108 million shares of SkyComm common stock. Second, another $ 4 million of the ClearSky Investors' money would be paid to SkyComm directly in exchange for the 133 million shares of SkyComm common stock.
Pouliot noted that appellants gave him the Confidential Investment Memorandum, prepared by Balaton, and he reviewed it and relied on it when he decided to invest his company's money in ClearSky. The memorandum stated:
ClearSky Limited Partnership (the "Partnership") has been formed for the purpose of acquiring control of SkyPort International Inc. ("SkyPort") through its parent corporation, SkyComm Technologies Corporation ("SkyComm") , and assisting SkyComm and SkyPort in realizing significant capital appreciation through organic and structured growth. The General Partner of the Partnership is ClearSky Management, Inc., a wholly-owned subsidiary of Balaton Group Inc. ("Balaton")....
The investment contemplated by this offering will support the acquisition and re-structuring of SkyComm and SkyPort by the Partnership. Balaton will assign to the Partnership its rights under certain agreements it has entered into with SkyComm, SkyPort and their secured creditors. By applying the maximum proceeds of this offering in exercise of the rights offered by such agreements, the Partnership will acquire ownership of SkyComm common stock and securities of SkyComm convertible into SkyComm common stock representing approximately 76% percent of the issued and outstanding shares of SkyComm, together with common stock purchase warrants which, if exercised by the Partnership, would increase its fully-diluted ownership position to 82%, excluding any dilution resulting from further recapitalization of SkyComm. The General Partner plans to take SkyComm public within 12 months following the completion of the offering....
....
SUMMARY OF THE OFFERING
Issuer Clear Sky Investments, LP....
Issue Class A Limited Partnership interests structured as units
....
Use of Proceeds ....
(iii) The Partnership will purchase an aggregate of 133,000,000 shares of common stock and 133,000,000 warrants of SkyComm for an aggregate purchase price of $ 4,000,000 ....
(iv) The Partnership will purchase $ 20,596,000 face amount of convertible debentures of SkyComm from the incumbent holder. The debentures convert into an aggregate of 108,000,000 shares of common stock of *482 SkyComm. Completion of the purchase will be deferred until receipt of FCC approval to the acquisition of control of SkyComm and SkyPort by the Partnership.
....
(Emphasis added.)
Pouliot further testified that the Confidential Investment Memorandum and the representations that he received from appellants led him to believe that, by virtue of the SkyPort transaction, ClearSky would acquire, own, and control SkyComm and SkyPort. In fact, the memorandum stated that the entire purpose of the formation of ClearSky was to raise money to obtain ownership and control of SkyComm and SkyPort. However, the memorandum did not state that the ClearSky Investors were required to invest $ 10 million in ClearSky for the SkyPort transaction to occur.[58] And appellants never told Pouliot that there was a chance that ClearSky would not acquire any ownership of SkyComm and SkyPort.
Further, Pouliot explained that appellants, through statements made in the Confidential Investment Memorandum, represented that Balaton would assign any rights or interests it had acquired in SkyComm and SkyPort to ClearSky as part of the SkyPort transaction. And appellants, through statements made in the memorandum, informed Pouliot that ClearSky would be the entity that purchased CenturyTel's debentures and the 133 million shares of SkyComm common stock at the closing of the SkyPort transaction. In other words, appellants represented that, under the terms of the SkyPort transaction, as described in the memorandum, ClearSky would pay CenturyTel $ 3 million and receive $ 20,596,000 in convertible debentures, and ClearSky would pay SkyComm $ 4 million and receive the 133 million shares of SkyComm common stock. Moreover, pursuant to the memorandum, appellants would seek approval from the FCC for ClearSky's ownership and control of SkyComm and SkyPort.
In September 2006, Pouliot decided to invest, through his company, Draco Capital, Inc., $ 3,816,523 in ClearSky. In doing so, Pouliot relied on the aforementioned representations made by appellants and the documents provided to him by appellants. And in the course of making his investment, Pouliot, like every ClearSky Investor, signed the ClearSky Limited Partnership Agreement. Pouliot explained that when he signed the ClearSky Limited Partnership Agreement, Kubbernus again told him that the purpose of ClearSky was to acquire, or own, SkyComm and SkyPort. And at the closing of the SkyPort transaction, ClearSky would own SkyComm and SkyPort. Pouliot explained that he was never told that under any circumstances ClearSky would not have ownership of SkyComm and SkyPort. And if he had been told that there was a possibility that the ClearSky Investors, and ClearSky, would not receive anything in exchange for the money that they invested in ClearSky, he would not have invested any money in ClearSky.
It was not until in August 2009, almost two years after the closing of the SkyPort transaction, that Pouliot first became aware that ClearSky did not have any ownership interest in SkyComm and SkyPort; Balaton had never assigned any of its interests or rights in SkyComm and SkyPort to ClearSky; and Balaton, using the *483 ClearSky Investors' money, had purchased for itself CenturyTel's debentures and the 133 million shares of SkyComm common stock at the closing of the SkyPort transaction. In fact, Kubbernus, while testifying during the second bankruptcy proceeding, specifically stated that ClearSky and the ClearSky Investors had "absolutely no interest" in SkyComm and SkyPort and "no right whatsoever to any of the shares" of SkyComm common stock. He further told the bankruptcy court that because the ClearSky Investors did not invest $ 10 million in ClearSky, but instead invested only $ 7 million, they "never had [any] shares" and were entitled to "nothing" in regard to SkyComm and SkyPort.
Pouliot further testified that the ClearSky Investors' main complaint about the SkyPort transaction and appellants' actions surrounding the SkyPort transaction was that the ClearSky Investors' money was supposed to be used by ClearSky to purchase CenturyTel's debentures and the 133 million shares of SkyComm common stock, and appellants falsely represented to the ClearSky Investors that ClearSky "would be the owner" of CenturyTel's debentures and the 133 million shares of common stock upon the closing of the SkyPort transaction. In other words, appellants "stole[ ]" the ClearSky Investors' money and used that money, in the SkyPort transaction, to acquire CenturyTel's debentures and the 133 million shares of SkyComm common stock for themselves, leaving the investors without their money or ownership of SkyComm and SkyPort. Further, because of the "fraudulent appropriation" of the ClearSky Investors' money by appellants, the ClearSky Investors "lost the[ir] money" and did not receive anything in return for the $ 7 million that they had invested in ClearSky.
Kubbernus testified that each ClearSky Investor was given the Confidential Investment Memorandum, prepared by Balaton, prior to each of them deciding to invest in ClearSky. And appellants intended for the ClearSky Investors to rely on the Confidential Investment Memorandum when making their decisions to invest in ClearSky. Further, the ClearSky Investors, once they had decided to invest their money in ClearSky, signed the ClearSky Subscription Agreement, in which they affirmed that they had read the Confidential Investment Memorandum and the ClearSky Limited Partnership Agreement and relied on the information contained in them when deciding to invest in ClearSky.
Kubbernus conceded that the Confidential Investment Memorandum informed the ClearSky Investors that they would acquire ownership of SkyComm and SkyPort as part of the SkyPort transaction; ClearSky would purchase the 133 million shares of SkyComm common stock; and Balaton would assign its rights related to SkyComm and SkyPort, including those under the SPA and DPA, to ClearSky.[59]
Kubbernus further testified that despite the representations made in the Confidential Investment Memorandum, appellants never intended for ClearSky to obtain ownership of SkyComm and SkyPort or acquire CenturyTel's debentures and the *484 133 million shares of SkyComm common stock when the SkyPort transaction closed. Rather, appellants always intended for Balaton to purchase CenturyTel's debentures and the 133 million shares of SkyComm common stock at the closing of the SkyPort transaction. Despite these intentions, appellants used the ClearSky Investors' money so that Balaton could purchase, for itself, CenturyTel's debentures and the 133 million shares of SkyComm common stock, which it did. In fact, Kubbernus, at the closing of the SkyPort transaction, told CenturyTel to sell its debentures to Balaton and he told SkyComm to sell its shares of common stock to Balaton. And Balaton never assigned any of its rights in SkyComm or SkyPort to ClearSky.
Kubbernus explained that ClearSky never obtained ownership rights to SkyComm and SkyPort, and it did not acquire CenturyTel's debentures or the 133 million shares of SkyComm common stock.[60] Instead, according to Kubbernus, ClearSky "ended up" with "[a] [d]ifferent economic interest than what[ ] [had been] represented" by appellants to the ClearSky Investors in the Confidential Investment Memorandum. Specifically, as a result of the SkyPort transaction, ClearSky merely received "an interest in acquiring ... stock" at some point in the future.[61] Kubbernus could not recall whether, before the second bankruptcy proceeding in August 2009, he had ever disclosed to the ClearSky Investors that ClearSky had not received CenturyTel's debentures or the 133 million shares of SkyComm common stock, even though the ClearSky Investors' money was used to complete the SkyPort transaction.
In regard to the FCC, Kubbernus testified that appellants had never submitted an application to the FCC to obtain approval for ClearSky to purchase SkyComm and SkyPort. And he conceded that he had never told the ClearSky Investors that FCC approval would not be sought, and had not been sought, on ClearSky's behalf. And although, before Pouliot had invested his company's money in ClearSky, Kubbernus sent to Pouliot an email in which he stated that FCC approval for ClearSky's ownership of SkyComm and SkyPort would be sought, appellants never actually sought such approval. Instead, appellants submitted an FCC application, subsequently approved by the FCC, stating: "This application seeks [the] Commission['s] consent for [the] transfer of control of SkyPort International, Inc. from CenturyTel, Inc. to Balaton Group Inc."
In regard to the Additional Investors and the Lavell Investors, Craig testified that he had learned of the investment opportunity related to SkyComm and SkyPort from Kubbernus, he spoke with Kubbernus, and Kubbernus actually met with his investors. Craig explained that appellants never told the Additional Investors and the Lavell Investors that the ClearSky Investors, "who funded" the SkyPort transaction, actually received "nothing" in exchange for their investment. Instead, appellants told the Additional Investors and the Lavell Investors that the ClearSky Investors owned shares, were "happy," and had received what they had been promised, and the Additional Investors and the Lavell Investors "should invest just like the[ ] [ClearSky Investors] did." If the Additional Investors and the Lavell *485 Investors had known the "the truth" about what had occurred with the ClearSky Investors' money, then they "would have never invested and would never have lost [their money]." In other words, if the Additional Investors and the Lavell Investors "had known that ... shares [had not] be[en] given to the people that [had] put their hard money up," i.e., the ClearSky Investors, then they would not have invested their money with appellants.[62]
Kubbernus, in regard to the Additional Investors and the Lavell Investors, testified that he never told them, or gave them any other information that would have disclosed, that the ClearSky Investors "had put up $ 7 million and gotten nothing in return."
Here, appellees presented ample evidence, as detailed above, that supports the jury's finding that appellants made material misrepresentations or omissions to appellees, and appellants have not demonstrated that no evidence supports the finding. See Examination Mgmt. Servs. , 367 S.W.3d at 839. And appellants have not demonstrated that the jury's finding is so contrary to the overwhelming weight of the evidence as to be clearly wrong and manifestly unjust. See Cain , 709 S.W.2d at 176. According, we hold that the evidence is legally and factually sufficient to support the jury's finding that appellants made "an untrue statement of a material fact or an omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading." See TEX. REV. CIV. STAT. ANN. art. 581-33(A)(2).
We overrule this portion of appellants' first issue.
Loss Causation
Appellants next assert that the evidence is legally and factually insufficient to establish that any material misrepresentation or omission made by them caused the "damages awarded to [appellees]." In response, appellees assert that they need not have proved causation.
As previously noted, the TSA provides that "[a] person who offers or sells a security ... by means of an untrue statement of a material fact or an omission to state a material fact necessary in order to make the statements made ... not misleading, is liable to the person buying the security from him." Id. This provision establishes the elements (and defenses) of a cause of action for misrepresentations or omissions made in connection with a securities transaction. See TEX. REV. CIV. STAT. ANN. art. 581-33(A)(2) ; Duperier , 28 S.W.3d at 745, 753. Notably, loss causation is not an element of a securities-violations claim brought under this particular provision of the TSA.[63] Duperier , 28 S.W.3d at 753-54 ("Article 581-33A(2) has never included loss causation."); see also In re Countrywide Fin. Corp. Mortg.-Backed Sec. Litig. , 84 F.Supp.3d 1036, 1042 & n.5, 1043 & n.7 (C.D. Cal. 2014) (no causation element); Nat'l Credit Union Admin. Bd. v. Morgan Stanley & Co. , No. 13 Civ. 6705(DLC), 2014 WL 1673351, at *3-4 (S.D.N.Y. Apr. 28, 2014).
Accordingly, we hold that appellees were not required to prove causation as an element of their claims for securities violations under the TSA. See TEX. REV. CIV. STAT. ANN. art. 581-33(A)(2).
*486 We overrule this portion of appellants' first issue.
Attorney's Fees
In their second issue, appellants argue that the evidence is factually insufficient to support the trial court's award of attorney's fees to appellees because appellees "needed to segregate [their] fees incurred advancing their TSA claims against appellants."
We review a trial court's award of attorney's fees for an abuse of discretion. El Apple I, Ltd. v. Olivas , 370 S.W.3d 757, 761 (Tex. 2012). Evidentiary sufficiency issues are not independent grounds under this standard but are relevant factors in assessing whether the trial court abused its discretion. Beaumont Bank, N.A. v. Buller , 806 S.W.2d 223, 226 (Tex. 1991) ; Halsey v. Halter , 486 S.W.3d 184, 187 (Tex. App.-Dallas 2016, no pet.). The hybrid analysis involves a two-pronged inquiry: (1) whether the trial court had sufficient evidence upon which to exercise its discretion, and (2) if so, whether the trial court erred in its application of that discretion. City of Hous. v. Kallinen , 516 S.W.3d 617, 626 (Tex. App.-Houston [1st Dist.] 2017, no pet.).
A party may not recover attorney's fees unless such fees are authorized by statute or contract. See Tony Gullo Motors I, L.P. v. Chapa , 212 S.W.3d 299, 310 (Tex. 2006). Under the TSA, a prevailing party may be awarded its reasonable attorney's fees if the court finds that such an award "would be equitable in the circumstances." TEX. REV. CIV. STAT. ANN. art. 581-33(D)(7) ; see also Mixon v. Nelson , No. 03-15-00287-CV, 2016 WL 4429936, at *4 (Tex. App.-Austin Aug. 19, 2016, no pet.) (mem. op.) (attorney's fees statutorily authorized in suit involving claims for violations of TSA); Matlock v. Hill , No. 07-15-00048-CV, 2016 WL 3659988, at *6 (Tex. App.-Amarillo June 30, 2016, no pet.) (mem. op.). An award of attorney's fees is not automatic under the TSA, but rests in the sound discretion of the trial court. See TEX. REV. CIV. STAT. ANN. art. 581-33 cmt.; Gaiser , 2007 WL 906328, at *9 ; Grant Thornton , 133 S.W.3d at 362 n.12. In determining whether an award of attorney's fees is equitable and what amount is equitable, "[a]ll the circumstances should be considered," including: (1) the conduct of the defendant in the transaction, including whether the conduct was fraudulent; (2) the conduct of the plaintiff in the transaction; (3) the conduct of both parties in the lawsuit; (4) whether the defendant benefited from the securities violation; and (5) whether there was a special fiduciary relationship between the plaintiff and the defendant. See TEX. REV. CIV. STAT. ANN. art. 581-33 cmt.; Morgan Keegan & Co. v. Purdue Ave. Inv'rs LP , No. 05-15-00369-CV, 2016 WL 2941266, at *14 (Tex. App.-Dallas May 18, 2016, pet. denied) (mem. op.).
Here, the trial court, after a hearing on attorney's fees, awarded the ClearSky Investors, the Additional Investors, and the Lavell Investors attorney's fees, pursuant to TSA article 581-33(D)(7), in the amount of $ 2,020,052.41 for trial,[64] $ 55,000 in the *487 event of an appeal to the court of appeals, $ 20,000 in the event that a petition for review is filed with the Texas Supreme Court, and $ 35,000 if the petition is granted.[65] See TEX. REV. CIV. STAT. ANN. art. 581-33(D)(7).
Appellants do not assert that the attorney's fees awarded by the trial court are unreasonable, unnecessary, or inequitable. Rather, they assert that "[i]n a case involving dozens of plaintiffs/defendants and numerous theories of liability, some portion of [appellees'] attorney's fees are likely unrecoverable" and appellees "made no attempt to segregate recoverable fees from those incurred in pursuing losing or non-fee-recoverable claims." Instead, appellees "took 400 pages of [attorney] billing records" and "opined that their [attorneys'] work could be segregated as follows: "30%: preparation necessary and work incurred at the trial"; "20%: Texas Securities Act claims and fraud claims"; "20%: unrecoverable claims"; and "20%: intertwined claims." (Internal quotations omitted.) According to appellants, use of percentages "is simply inappropriate," "it cannot be said that all of [appellees' attorneys'] trial work advanced their TSA claims against appellants," appellees were required to segregate their attorney's fees recoverable under the TSA from those that were not, and "half of [appellees' attorneys'] work was devoted to advancing claims against [other] [d]efendants." Essentially, appellants contend that appellees have failed to properly segregate non-recoverable fees from those fees that are recoverable in the instant case.
"[Attorney's] fee claimants have always been required to segregate fees between claims for which they are recoverable and claims for which they are not." Chapa , 212 S.W.3d at 311 ; see also Kinsel v. Lindsey , 526 S.W.3d 411, 427 (Tex. 2017) ; Arrow Marble, LLC v. Estate of Killion , 441 S.W.3d 702, 709 (Tex. App.-Houston [1st Dist.] 2014, no pet.). The need to segregate attorney's fees is a question of law, and the extent to which certain claims can or cannot be segregated is a mixed question of law and fact. Chapa , 212 S.W.3d at 312-13 ; CA Partners v. Spears , 274 S.W.3d 51, 81 (Tex. App.-Houston [14th Dist.] 2008, pet. denied).
"[I]f any attorney's fees relate solely to a claim for which such fees are *488 unrecoverable, a claimant must segregate recoverable from unrecoverable fees." Chapa , 212 S.W.3d at 313. "Intertwined facts do not make [certain] fees recoverable; it is only when discrete legal services advance both a recoverable and unrecoverable claim that they are so intertwined that they need not be segregated." Id. at 313-14. For example, where segregation is required, attorneys are not required to "keep separate time records when they drafted the fraud, contract, or DTPA paragraphs of [the] petition." Id. at 314. Rather, "an opinion w[ill] ... suffice[ ] stating that, for example, 95 percent of their drafting time would have been necessary even if there had been no fraud claim." Id. ; see also 7979 Airport Garage, L.L.C. v. Dollar Rent A Car Sys., Inc. , 245 S.W.3d 488, 506 (Tex. App.-Houston [14th Dist.] 2007, pet. denied). Further,
[r]equests for standard disclosures, proof of background facts, depositions of the primary actors, discovery motions and hearings, voir dire of the jury, and a host of other services may be necessary whether a claim is filed alone or with others. To the extent such services would have been incurred on a recoverable claim alone, they are not disallowed simply because they do double service.
Chapa , 212 S.W.3d at 313.
"[T]o meet a party's burden to segregate its attorney['s] fees, it is sufficient to submit to the fact-finder testimony from a party's attorney concerning the percentage of hours" related to claims for which fees are not recoverable. Berryman's S. Fork, Inc. v. J. Baxter Brinkmann Int'l Corp. , 418 S.W.3d 172, 202 (Tex. App.-Dallas 2013, pet. denied) (first alteration in original) (internal quotations omitted); see also Chapa , 212 S.W.3d at 314 & n.83 ; Young v. Dimension Homes, Inc. , No. 01-14-00331-CV, 2016 WL 4536407, at *10 (Tex. App.-Houston [1st Dist.] Aug. 30, 2016, no pet.) (mem. op.) ("[A]ttorney can satisfy his evidentiary burden by presenting evidence of unsegregated attorney's fees and a rough percentage of the amount attributable to the claims for which fees are not recoverable."). When a party does not appropriately segregate its attorney's fees between recoverable and unrecoverable claims in the court below and we determine segregation is required, the fee award must be reversed and the case must be remanded to the trial court to determine which fees are recoverable. Chapa , 212 S.W.3d at 314 ; Young , 2016 WL 4536407, at *10.
In their Amended Motion for Entry of Judgment, appellees stated that although they had prevailed on several claims against appellants, they elected to recover on their securities-violations claims under the TSA, and thus, they requested their attorney's fees pursuant to TSA article 581-33(D)(7). In addressing segregation of their attorney's fees, appellees noted that certain claims were dismissed prior to trial, and at the time of trial, their claims consisted of breach of fiduciary duties, securities violations under the TSA, fraud, and conspiracy against appellants and other defendants. Although not all claims were successful, the ClearSky Investors, the Additional Investors, and the Lavell Investors all prevailed on their fraud claims and their securities-violation claims under the TSA.
In his affidavit, attached to appellees' Amended Motion for Entry of Judgment, appellees' attorney, Eric Fryar, testified that he: is a licensed attorney in Texas; has been practicing law in Texas since 1989; is lead counsel for appellees; and is "acquainted with the reasonable, necessary, and customary fees charged in commercial disputes such as th[e] [instant] one." Fryar's law firm, along with co-counsel Samuel Goldman & Associates and Harold *489 Obsfeldt, represented appellees in this case. According to Fryar, the total amount of reasonable and necessary attorney's fees incurred by appellees in this case was $ 4,809,681.90.[66]
Fryar explained that appellees had "elected the [TSA] remedy" because under the TSA "attorney['s] fees are recoverable." And "[w]ith respect to the preparation necessary and the work incurred at the trial [of appellees' claims], there was [an] extensive overlap among the factual aspects of the various claims." Further, the "primary theory" of liability in this case "centered around" the "theft of the ClearSky Investors' shares," and in order for the Additional Investors and the Lavell Investors to prevail on their claims, proof of "the case of the ClearSky Investors" was required. Further, the claims of other plaintiffs, who did not prevail at trial, and for appellees' "claims for secondary liability against CenturyTel" also required proof of "the case of the ClearSky Investors." Thus, even "if the claims for which attorney['s] fees [were] sought were the only claims in the case and all other claims and defendants had not been present, the work required [for appellees] to prevail would have been largely the same."
Fryar then testified to the following in regard to the segregation of the $ 4,809,681.90 in attorney's fees:
• 20% of the work performed, or $ 961,936.38 in attorney's fees, related exclusively to the claims on which appellees' prevailed against appellants on which attorney's fees were recoverable;
• 30% of the work performed, or $ 1,442,904.57 in attorney's fees, related exclusively to claims where either attorney's fees were not recoverable or appellees did not prevail;
• 30% of the work performed, or $ 1,442,904.57 in attorney's fees, involved tasks[67] that would have been completed by appellees "regardless of the number of claims" brought by them; and
• 20% of the work performed, or $ 961,936.38 in attorney's fees, involved "intertwined recoverable and non-recoverable claims-overlapping facts and circumstances, together with the similarity of the law, [and] the elements necessary to prove, make it impossible to separate those claims."
Thus, based on these percentages, the total amount of attorney's fees sought by appellees, related to work performed through trial, was $ 3,366,777.33.[68]
It is not necessary for an attorney to keep separate records documenting the exact amount of time spent pursuing one claim versus another to prove that the *490 amount of attorney's fees sought is sufficiently segregated. See Chapa , 212 S.W.3d at 314 & n.83 ; Young , 2016 WL 4536407, at *10. Rather, segregation is sufficiently established if an attorney testifies that a given percentage of the time worked would have been necessary even if the claim for which attorney's fees are unrecoverable had not been asserted. State Farm Lloyds v. Hanson , 500 S.W.3d 84, 105 (Tex. App.-Houston [14th Dist.] 2016, pet. denied).
Here, Fryar opined that 70% of the work performed by appellees' attorneys was either directly related to appellees' claims for securities violations under the TSA, so intertwined with the work for appellees' securities-violations claims that "it [was] impossible to separate,"[69] or would have been performed by appellees "regardless of the number of claims" brought by them against appellants and other defendants. See Sentinel Integrity Sols., Inc. v. Mistras Grp., Inc. , 414 S.W.3d 911, 929-30 (Tex. App.-Houston [1st Dist.] Oct. 22, 2013, pet. denied) (attorney testified at least 90% of work "was work that either directly related to defending ... the non-compete claim or was so intertwined that it could not be separated"); Berryman's S. Fork , 418 S.W.3d at 202 (attorney testified 85% or $ 127,073 of attorney's fees "[were] recoverable against the [d]efendants in th[e] lawsuit," "it [was] reasonable to conclude that [plaintiff's] counsel's activities c[ould not] all be segregated by task and as such [were] dependent on the same or similar set of facts and circumstances," and attorney's fees were "therefore so intertwined that they c[ould not] be so separated or segregated" (second and fifth alterations in original) (internal quotations omitted)). Fryar also testified that he did not consider 30% of the work performed for appellees because it related to claims for which appellees did not prevail or for which attorney's fees were not recoverable. See Bacon Tomsoms, Ltd. v. Chrisjo Energy, Inc. , No. 01-15-00305-CV, 2016 WL 4217254, at *15 (Tex. App.-Houston [1st Dist.] Aug. 9, 2016, no pet.) (mem. op.). The trial court then awarded less than the full amount of attorney's fees requested by appellees. See id.
We conclude that appellees sufficiently segregated their attorney's fees. Accordingly, we hold that the trial court did not err in awarding appellees attorney's fees as it did pursuant to TSA article 581-33(D)(7).
We overrule appellants' second issue.
Conclusion
We affirm the judgment of the trial court.

See Tex. Rev. Civ. Stat. Ann. art. 581-33(A)(2) (Vernon 2010).


See id. art. 581-33(D)(7). Appellants also contend that the evidence is insufficient to support the jury's findings in favor of appellees on their fraud claims; however, appellees elected to recover on their claims for securities violations under the TSA. Accordingly, we do not address appellants' arguments related to appellees' fraud claims. See Tex. R. App. P. 47.1.


See id. art. 581-33(H)(2)(b).


According to appellees, SkyPort was originally known as SkyComm International, Inc., a Texas corporation with its headquarters in Houston, Texas. In 2002, the shareholders of SkyComm International, Inc. exchanged their shares of stock for shares of stock in SkyComm Technology Corporation ("SkyComm"), a Delaware holding company with its principal office and activities in Houston, Texas. SkyComm International, Inc. then became a wholly-owned Texas subsidiary of SkyComm and was renamed SkyPort. In 2009, SkyComm was merged into its Texas subsidiary, SkyPort, as part of a "Chapter 11 [Bankruptcy] Reorganization Plan." According to testimony at trial, SkyComm had no employees and conducted all of its operations through SkyPort.


Appellees alleged that section 214 of the Communications Act of 1934 (the "Act") required SkyPort, "as a prospective operator of an international telecommunications facility and satellite earth station, to obtain a certificate of public convenience and necessity from the FCC prior to" the construction of its teleport. Further, under the Act, any future "transfer[ ] of control of [SkyPort's] international telecommunications facilit[y] and of interests within controlling entities [of SkyPort would] require FCC approval." "[T]ransfers of control involving foreign ownership [would] require additional approvals from the FCC and other United States governmental agencies." See generally 47 U.S.C. § 214.


CenturyTel is now known as CenturyLink, Inc.


CenturyTel never converted any of its SkyComm debentures.


The investor group was to purchase the 133 million shares of SkyComm common stock and warrants. The warrants would allow the investor group to buy more shares of SkyComm common stock in the future "over a certain period of time at a predetermined price." For purpose of this opinion, we will refer to the 133 million shares of SkyComm common stock and warrants together.


The following appellees were ClearSky Investors: ECAL Partners, Ltd. ($ 50,000 investment), Draco Capital, Inc. ($ 3,816,523 investment), Robert Mendel, as assignee of Edward Pascal ($ 50,000 investment), Robert Mendel ($ 50,000 investment), Robert Mendel, as assignee of Stanley Beraznik ($ 50,000 investment), Robert Mendel, as assignee of Don Bui ($ 10,682 investment), Robert Mendel, as assignee of Ben Ariano ($ 10,733 investment), 3791068 Canada, Inc. ($ 50,000 investment), Peter Taylor ($ 1,000,000 investment), Sequoia Aggressive Growth Fund, Ltd., as successor to Sequoia Diversified Growth Fund ($ 350,000 investment), Sequoia Aggressive Growth Fund, Ltd., as assignee of Semper Gestion, S.A. ($ 159,257 investment), Eosphoros Asset Management, Inc. ($ 200,000 investment), and George DeWolf ($ 100,000 investment).


The DPA also required that the FCC approve the transfer of control of SkyComm and SkyPort before the closing of the SkyPort transaction.


Appellees allege that upon realizing that Watershed could not be organized in a timely manner, Kubbernus decided to use ClearSky to serve as the sole investment vehicle for the purchase of CenturyTel's debentures.


If the ClearSky Investors invested less than $ 10 million in ClearSky, then ClearSky would receive a proportionately reduced ownership interest in SkyComm and SkyPort. However, the ClearSky Investors would at least receive something in return for their investment.


For instance, when, in spring 2006, CenturyTel, Balaton, Kubbernus, SkyComm, and SkyPort prepared the FCC applications for the transfer of control of SkyComm and SkyPort, the applications stated that it would be Balaton, not ClearSky, that would obtain ownership of SkyComm and SkyPort. No disclosure of ClearSky's planned ownership and control of SkyComm and SkyPort was ever made to the FCC.


Appellees also allege that it was not until 2009, when Kubbernus testified before a bankruptcy court, that they were first informed that Balaton had never actually assigned any of its rights to ClearSky and it had not received any ownership interest in SkyComm or SkyPort at the closing of the SkyPort transaction. See infra.


The following appellees were Additional Investors: Darshan Khurana ($ 50,089 investment), Matteo Novelli ($ 110,020 investment), Sequoia Aggressive Growth Fund, Ltd. ($ 1,717,916 investment), Sequoia Aggressive Growth Fund, Ltd., as successor to Sequoia Diversified Growth Fund ($ 799,667.23 investment), Sequoia Aggressive Growth Fund, Ltd., as assignee of Rig III, Ltd. ($ 801,147.34 investment), Sequoia Aggressive Growth Fund, Ltd., as assignee of Aran Asset Management ($ 495,393 investment), Ashwin Sairam ($ 18,692 investment), and 99869 Canada, Inc. ($ 100,179 investment). Appellees allege that the Additional Investors invested funds in SkyComm in 2007 and 2008.


The following appellees were Lavell Investors: Sequoia Aggressive Growth Fund, Ltd., as assignee of Achim Glauner ($ 110,026.79 investment), Sequoia Aggressive Growth Fund, Ltd., as assignee of Karl-Heinz Glauner ($ 250,017.82 investment), Sequoia Aggressive Growth Fund, Ltd., as assignee of Christian Glauner ($ 60,678.68 investment), Sequoia Aggressive Growth Fund, Ltd. ($ 500,000 investment), Sequoia Aggressive Growth Fund, Ltd., as successor to Sequoia Diversified Growth Fund ($ 250,000 investment), Sequoia Aggressive Growth Fund, Ltd., as assignee of Semper Gestion, S.A. ($ 500,000 investment), David Burtnik ($ 24,689 investment), Mary Hanemaayer ($ 123,444 investment), and Marlene Tersigni ($ 20,125 investment). Appellees allege that the Lavell Investors purchased securities from SkyComm or from Lavell in 2007 and 2008 in connection with the taking of SkyPort public through a "Lavell IPO." The majority of the Lavell Investors were also either ClearSky Investors or Additional Investors.


See Tex. Rev. Civ. Stat. Ann. art. 581-33(A)(2).


See id. art. 581-33(D)(7) (attorney's fees). Appellees brought additional claims against other defendants who are not parties to this appeal.


See id. art. 581-33(D)(3), (6), (7).


See id.


See id.


Several witnesses referred to Pouliot as the lead ClearSky Investor. The trial testimony of other ClearSky Investors largely mirrors the testimony of Pouliot.


The Confidential Investment Memorandum states that if the ClearSky Investors invested less than $ 10 million in ClearSky, then "there would be a [proportionate] reduction in the number of shares purchased by [ClearSky]."


According to Pouliot, SkyComm and SkyPort had three different licenses that needed FCC approval before they could be transferred to a new owner. When appellants filed the initial FCC application for the transfer of licenses, the application listed Balaton as the new owner of SkyComm and SkyPort. Subsequently, however, Kubbernus told Pouliot, in an email dated April 1, 2006 and admitted into evidence by the trial court, that the initial FCC application would be amended to disclose ClearSky as the new owner of SkyComm and SkyPort. This never occurred.


The Confidential Information Memorandum and the ClearSky Limited Partnership Agreement also stated that Balaton would assign any of its rights under the SPA to ClearSky, including its right to purchase the 133 million shares of SkyComm common stock.


An Amended and Restated Debenture Purchase Agreement, signed on November 2, 2006, the closing date of the SkyPort transaction, states, in pertinent part:
This AMENDED AND RESTATED DEBENTURE PURCHASE AGREEMENT, dated as of November 2, 2006, is by and among CenturyTel, Inc., a corporation incorporated under the laws of the State of Louisiana (the "Seller"), Balaton Group Inc., a corporation incorporated under the laws of the Province of Ontario, Canada (the "Purchaser"), and SkyComm Technologies Corporation, a corporation incorporated under the laws of the State of Delaware (the "Company") that conducts substantially all of its operations through its wholly-owned subsidiary, SkyPort International, Inc., a corporation incorporated under the laws of the State of Texas ("SkyPort").


Pouliot further noted that he met with Kubbernus and Stewart Ewing, the Chief Financial Officer of CenturyTel, in Houston, Texas to discuss the acquisition of SkyComm and SkyPort. And in September 2006, before he had invested his company's money in ClearSky, Pouliot again met with Kubbernus and SkyPort's management team.


Kubbernus confirmed that it was his handwriting on the "SkyPort Shareholders List."


In several emails, admitted into evidence by the trial court, appellants failed to tell Pouliot that ClearSky would receive "zero" ownership of SkyComm and SkyPort if the ClearSky Investors invested only $ 7 million in ClearSky. Instead, appellants had always represented that if the ClearSky Investors invested less than $ 10 million in ClearSky, then there would be a proportionate reduction in ClearSky's ownership in SkyComm and SkyPort.


Kubbernus, as the president of Balaton, signed the ClearSky Limited Partnership Agreement on behalf of the general partner, ClearSky Management.


Craig's investors included Sequoia Aggressive Growth Fund, Ltd. (Additional Investor, and Lavell Investor), Sequoia Diversified Growth Fund (ClearSky Investor, Additional Investor, and Lavell Investor), Rig III, Ltd. (Additional Investor), Semper Gestion, S.A. (ClearSky Investor and Lavell Investor), Aran Asset Management (Additional Investor), Achim Glauner (Lavell Investor), Karl-Heinz Glauner (Lavell Investor), and Christian Glauner (Lavell Investor). Sequoia Diversified Growth Fund, Rig III, Ltd., Semper Gestion, S.A., Aran Asset Management, and the Glauners assigned their claims to Sequoia Aggressive Growth Fund, Ltd., and Craig testified at trial on behalf of Sequoia Aggressive Growth Fund, Ltd. and its assignors. We note that other Additional Investors and Lavell Investors also testified at trial.


According to Craig, appellants "cut ... off" the investment in ClearSky at $ 7 million so that they could "start another round [of investments] at a higher level."


The ClearSky Subscription Agreement, admitted into evidence by the trial court, states, in pertinent part:
1. SUBSCRIPTION FOR INTERESTS . The undersigned hereby irrevocably subscribes for Class A Limited Partnership interests in Clear Sky Investments L.P., in the amount set forth on page 5 (for individuals) or 7 (for entities) of the Limited Partnership Agreement (minimum investment of $ 50,000.00 subject to the General Partner's discretion to accept less from certain qualified Subscribers).
2. REPRESENTATIONS AND WARRANTIES OF SUBSCRIBER . As an inducement to the General Partner to accept this subscription, Subscriber (for the Subscriber and, on behalf of and with respect to each of Subscriber's shareholders, partners or beneficiaries, if any), by executing and delivering this Subscription Agreement, represents and warrants to the Partnership, the General Partner, and the Additional Seller, if any, who solicited Subscriber's subscription as follows:
(a) I ... have received and carefully read a copy of the Confidential Investment Memorandum (the "Memorandum") and the Limited Partnership Agreement, relating to, and describing, the terms and conditions of the private placement of Interests.
....
(e) I have been furnished any materials relating to the Partnership and its operations, and any other related matters, which I have requested; the General Partner and its representatives have answered to my satisfaction all inquiries that I have put to them relating thereto and I have been afforded the opportunity to ask questions and obtain any additional information necessary to verify the accuracy of any representation or information set forth in the Memorandum or the Agreement.
(f) I have not been furnished any offering material or literature which was not accompanied by the Memorandum and I have relied only on the information in the Memorandum and the information furnished or made available to me pursuant to paragraph (e) above in determining to subscribe for Interests.
(Emphasis added.)


Craig noted that he was never told that Balaton would hold ClearSky's interest in SkyComm and SkyPort in "trust."


Craig noted that Kubbernus, himself, spoke directly to some of the Additional Investors.


In regard to the Lavell Investors, Pouliot testified that the Lavell prospectus, dated October 31, 2007, and admitted into evidence by the trial court, was "a little bit like the Confidential Information Memorandum but more sophisticated, more detailed." And its purpose was "to give [the Lavell] investors accurate information about the company so that they c[ould] make an informed decision about whether or not to invest." Pouliot noted that the Lavell prospectus did not contain "information [about] ... ClearSky," such as information about "the relationship between ClearSky and Balaton, [or] the fact that ClearSky was the owner of the shares of ... SkyComm."


Craig testified: "Kubbernus told me [that the ClearSky Investors] owned shares."


According to Craig, Kubbernus "stole money" from his investors.


Kubbernus testified at trial, and portions of his videotaped deposition were also played for the jury.


Kubbernus noted that he met with Pouliot before he decided to invest his company's money in ClearSky.


According to Kubbernus, at the closing of the SkyPort transaction, only Balaton acquired CenturyTel's debentures and the 133 million shares of SkyComm common stock.


Kubbernus advanced different theories as to why ClearSky did not receive any ownership interest in SkyComm and SkyPort. First, Kubbernus opined that the ClearSky Limited Partnership Agreement required that the ClearSky Investors invest $ 10 million in ClearSky, and if less than $ 10 million was invested, then Balaton was "under no obligation to transfer [to ClearSky] any portion of its rights" related to SkyComm and SkyPort. Second, Kubbernus opined that the ClearSky Limited Partnership Agreement provided that if the ClearSky Investors invested less than $ 10 million in ClearSky, then ClearSky was entitled to a proportionately reduced assignment of Balaton's rights related to SkyComm and SkyPort. Kubbernus classified ClearSky's interest in SkyComm and SkyPort as an "economic interest," which appellants were free to take away from ClearSky at any time. And Kubbernus testified that ClearSky was not entitled to its proportional or "economic interest" until ClearSky obtained FCC approval for its ownership and control of SkyComm and SkyPort and there was a "successful" "IPO." Kubbernus noted that he had never told any of the ClearSky Investors about these "theories."


Kubbernus also testified that he had never disclosed to either the Additional Investors or the Lavell Investors that ClearSky and the ClearSky Investors had received nothing for the $ 7 million that they had invested in ClearSky. In regard to the Additional Investors and the Lavell Investors, Kubbernus further noted that before they had made their decision to invest, he had made a presentation to them and Craig.


Brogan's father, Peter Taylor, is one of the ClearSky Investors.


Brogan noted that in 2009, Kubbernus, during the second bankruptcy proceeding, testified that ClearSky "didn't have any ownership" related to SkyComm and SkyPort.


See id. art. 581-33(A)(2). Because appellees elected to recover on their securities-violations claims, we need not address the jury's findings related to appellees' other claims.


The damages awarded to the ClearSky Investors on their securities-violations claims are as follows: ECAL Partners, Ltd. ($ 50,000), Draco Capital, Inc. ($ 3,816,523), Robert Mendel, as assignee of Edward Pascal ($ 50,000), Robert Mendel ($ 50,000), Robert Mendel, as assignee of Stanley Beraznik ($ 50,000), Robert Mendel, as assignee of Don Bui ($ 10,682), Robert Mendel, as assignee of Ben Ariano ($ 10,733), 3791068 Canada, Inc. ($ 50,000), Peter Taylor ($ 1,000,000), Sequoia Aggressive Growth Fund, Ltd., as successor to Sequoia Diversified Growth Fund ($ 350,000), Sequoia Aggressive Growth Fund, Ltd., as assignee of Semper Gestion, S.A. ($ 159,257), Eosphoros Asset Management, Inc. ($ 200,000), and George DeWolf ($ 100,000).
The damages awarded to the Additional Investors on their securities-violations claims are as follows: Darshan Khurana ($ 50,089), Matteo Novelli ($ 110,020), Sequoia Aggressive Growth Fund, Ltd. ($ 1,717,916), Sequoia Aggressive Growth Fund, Ltd., as successor to Sequoia Diversified Growth Fund ($ 799,667), Sequoia Aggressive Growth Fund, Ltd., as assignee of Rig III, Ltd. ($ 801,147), Sequoia Aggressive Growth Fund, Ltd., as assignee of Aran Asset Management ($ 495,393), Ashwin Sairam ($ 18,692), and 99869 Canada, Inc. ($ 100,179).
The damages awarded to the Lavell Investors on their securities-violations claims are as follows: Sequoia Aggressive Growth Fund, Ltd., as assignee of Achim Glauner ($ 110,027), Sequoia Aggressive Growth Fund, Ltd., as assignee of Karl-Heinz Glauner ($ 250,018), Sequoia Aggressive Growth Fund, Ltd., as assignee of Christian Glauner ($ 60,679), Sequoia Aggressive Growth Fund, Ltd. ($ 500,000), Sequoia Aggressive Growth Fund, Ltd., as successor to Sequoia Diversified Growth Fund ($ 250,000), Sequoia Aggressive Growth Fund, Ltd., as assignee of Semper Gestion, S.A. ($ 500,000), David Burtnik ($ 24,689), Mary Hanemaayer ($ 123,444), and Marlene Tersigni ($ 20,125).


Although appellants assert that thirty-one plaintiffs in this case constitute "foreign plaintiffs," they do not identify in their briefing which appellees constitute these thirty-one "foreign plaintiffs." We note that there are only twenty-six plaintiffs listed in the trial court's judgment and only twenty-six appellees on appeal. Appellants do not identify any specific appellee as a plaintiff who was prohibited from bringing a claim for securities violations under the TSA due to his/her status as a "foreign plaintiff." See Tex. R. App. P. 38.1(i) ; Wade v. Comm'n for Lawyer Discipline , 961 S.W.2d 366, 373 (Tex. App.-Houston [1st Dist.] 1997, no writ) ("An appellate court is under no duty to make an independent search of the record for evidence supporting an appellant's position.").


Restatement (Second) Conflict of Laws section 148(2) applies to fraud and misrepresentation claims and provides a six-factor test to be used in deciding choice-of-law issues by examining which state has the most significant relationship to the occurrence and the parties. See Berry v. Indianapolis Life Ins. Co. , No. 3:08-CV-0248-B, 2009 WL 804163, at *13 (N.D. Tex. Mar. 26, 2009) ; Vanderbilt Mortg. & Fin., Inc. v. Posey , 146 S.W.3d 302, 315 (Tex. App.-Texarkana 2004, no pet.). Section 148(2) states:
When the plaintiff's action in reliance took place in whole or in part in a state other than that where the false representations were made, the forum will consider such of the following contacts, among others, as may be present in the particular case in determining the state which, with respect to the particular issue, has the most significant relationship to the occurrence and the parties:
(a) the place, or places, where the plaintiff acted in reliance upon the defendant's representations,
(b) the place where the plaintiff received the representations,
(c) the place where the defendant made the representations,
(d) the domicil, residence, nationality, place of incorporation and place of business of the parties,
(e) the place where a tangible thing which is the subject of the transaction between the parties was situated at the time, and
(f) the place where the plaintiff is to render performance under a contract which he has been induced to enter by the false representations of the defendant.
See Restatement (Second) of Conflict of Laws § 148(2).


Again, appellants have not specified which particular appellees they assert lack standing as "foreign plaintiffs" to bring suit under the TSA. See Tex. R. App. P. 38.1(i) ; Wade , 961 S.W.2d at 373.


Appellants in their reply brief concede that the TSA is a different statute than the TFEAA.


We note that in Citizens Insurance Co. of America v. Daccach , the Texas Supreme Court also analyzed the question of the extraterritorial applicability of the TSA under the Restatement (Second) of Conflict of Law and engaged in a choice-of-law analysis. 217 S.W.3d 430, 442-46 (Tex. 2007). As previously noted, appellants have waived any choice-of-law complaint under Restatement (Second) of Conflict of Laws section 148(2).


See Tex. Rev. Civ. Stat. Ann. art. 581-33(A)(2), (C)(2).


Appellants assert that the claims for securities violations brought by appellees David Burtnik, Marlene Tersigni, Mary Hanemaayer, Sequoia Aggressive Growth Fund, Ltd., as assignee of Achim Glauner, Sequoia Aggressive Growth Fund, Ltd., as assignee of Christian Glauner, and Sequoia Aggressive Growth Fund, Ltd., as assignee of Karl-Heinz Glauner, are barred by the TSA's statute of repose.


Statutes of repose provide, in essence, "a definitive date beyond which an action cannot be filed." Galbraith Eng'g Consultants, Inc. v. Pochucha , 290 S.W.3d 863, 866 (Tex. 2009). Although a statute of repose limits a plaintiff's ability to bring a claim much like a traditional statute of limitations provision, a statute of repose, "[u]nlike traditional limitations provisions, which begin running upon accrual of a cause of action," "runs from a specified date without regard to accrual of any cause of action." Id.


For purposes of this opinion, we will consider appellants' assertion in their First Amended Answer that "Plaintiffs' claims are barred in whole or in part by the statute of limitations" as an assertion of their affirmative defense of statute of repose. See Ching Enters., Inc. v. Barahona , No. 14-14-00171-CV, 2016 WL 4706074, at *2-3 (Tex. App.-Houston [14th Dist.] Sept. 8, 2016, pet. denied) (mem. op.).


We note that appellants, in their First Motion for Partial Summary Judgment, "fully incorporate[d] by reference and adopt[ed]" the statute-of-limitations arguments advanced by CenturyTel in its Third Motion for Partial Summary Judgment. However, CenturyTel, in its motion, did not assert, as appellants now do on appeal, that any of appellees' claims for securities violations under the TSA are barred by the five-year statute-of-repose provided for in TSA article 581-33(H)(2)(b). See Tex. Rev. Civ. Stat. Ann. art. 581-33(H)(2)(b).


The Confidential Investment Memorandum states that if the ClearSky Investors invested less than $ 10 million in ClearSky, then "there would be a [proportionate] reduction in the number of shares purchased by [ClearSky]."


Kubbernus further explained that the Confidential Investment Memorandum did not tell the ClearSky Investors that ClearSky might acquire only some of Balaton's interests in SkyComm and SkyPort "maybe someday"; Balaton would use the ClearSky Investors' money for itself and ClearSky "might or might not" obtain any interest in SkyComm and SkyPort; if the ClearSky Investors did not invest $ 10 million in ClearSky, then ClearSky would receive "nothing," i.e., no ownership of SkyComm and SkyPort; and appellants could cancel ClearSky's "economic interest" in SkyComm and SkyPort at any time without notice.


According to Kubbernus, at the closing of the SkyPort transaction, only Balaton acquired CenturyTel's debentures and the 133 million shares of SkyComm common stock.


As noted above, Kubbernus advanced different theories as to why ClearSky did not receive any ownership interest in SkyComm and SkyPort. And he noted that he had never told any of the ClearSky Investors about these "theories."


According to Craig, Kubbernus "stole money" from the investors.


Appellants, in their brief, concede that at least one Texas court "has endorsed the idea" that "the TSA has no express loss or proximate causation requirement."


Each of the ClearSky Investors received the following amounts in attorney's fees: ECAL Partners, Ltd. ($ 8,867.69), Draco Capital, Inc. ($ 676,874.82), Robert Mendel, as assignee of Edward Pascal ($ 8,867.69), Robert Mendel ($ 8,867.69), Robert Mendel, as assignee of Stanley Beraznik ($ 8,867.69), Robert Mendel, as assignee of Don Bui ($ 1,894.49), Robert Mendel, as assignee of Ben Ariano ($ 1,903.54), 3791068 Canada, Inc. ($ 8,867.69), Peter Taylor ($ 177,353.79), Sequoia Aggressive Growth Fund, Ltd., as successor to Sequoia Diversified Growth Fund ($ 62,073.83), Sequoia Aggressive Growth Fund, Ltd., as assignee of Semper Gestion, S.A. ($ 28,244.83), Eosphoros Asset Management, Inc. ($ 35,470.76), and George DeWolf ($ 17,735.38).
Each of the Additional Investors received the following amounts in attorney's fees: Darshan Khurana ($ 8,883.47), Matteo Novelli ($ 19,512.46), Sequoia Aggressive Growth Fund, Ltd. ($ 304,678.92), Sequoia Aggressive Growth Fund, Ltd., as successor to Sequoia Diversified Growth Fund ($ 141,823.97), Sequoia Aggressive Growth Fund, Ltd., as assignee of Rig III, Ltd. ($ 142,086.46), Sequoia Aggressive Growth Fund, Ltd., as assignee of Aran Asset Management ($ 87,859.83), Ashwin Sairam ($ 3,315.10), and 99869 Canada, Inc. ($ 17,767.13).
Each of the Lavell Investors received the following amounts in attorney's fees: Sequoia Aggressive Growth Fund, Ltd., as assignee of Achim Glauner ($ 19,513.71), Sequoia Aggressive Growth Fund, Ltd., as assignee of Karl-Heinz Glauner ($ 44,341.64), Sequoia Aggressive Growth Fund, Ltd., as assignee of Christian Glauner ($ 10,761.65), Sequoia Aggressive Growth Fund, Ltd. ($ 10,761.65), Sequoia Aggressive Growth Fund, Ltd., as successor to Sequoia Diversified Growth Fund ($ 44,338.45), Sequoia Aggressive Growth Fund, Ltd., as assignee of Semper Gestion, S.A. ($ 88,676.90), David Burtnik ($ 4,348.69), Mary Hanemaayer ($ 21,893.26), and Marlene Tersigni ($ 3,569.25).
Appellants do not challenge the individual amounts of attorney's fees that each appellee received, and they do not appear to assert that appellees are not entitled to receive attorney's fees related to their claims for securities violations under the TSA.


Appellants do not challenge the trial court's award of appellate attorney's fees to appellees.


Fryar noted that this attorney's fees amount did not include "bankruptcy work" because the parties had agreed that any fees incurred "during the bankruptcy phase of th[e] [instant] case" would not be included in determining the amount of attorney's fees incurred by appellees.


These tasks included document review, document production, depositions of key witnesses, defending depositions, drafting and responding to discovery, and preparing for and attending trial.


Fryar also testified that "the reasonable value for the necessary services to be provided by [appellees' attorneys] in the event th[e] [trial court's] decision is unsuccessfully appealed to the court of appeals is $ 55,000.00." "If an unsuccessful petition for review is filed or responded to in the Texas Supreme Court by [appellants], the reasonable value of the necessary services is $ 20,000,00." And "[i]f the Texas Supreme Court grants a petition for review and [appellants] are unsuccessful in their appeal, the reasonable value of the necessary services for this firm in that instance is $ 35,000.00."


See, e.g. , Matlock v. Hill , No. 07-15-00048-CV, 2016 WL 3659988, at *8 (Tex. App.-Amarillo June 30, 2016, no pet.) (mem. op.) (explaining common-law fraud claims and statutory securities-violations claims under TSA "were more than intertwined," "proving one effectively proved aspects of the other").